UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No: 1: 15 CV 20356

MIADECO CORP., a Florida Corporation,
B & S TAXI CORP., a Florida
Corporation, CHECKER CAB
OPERATORS, INC., a Florida
Corporation, and PHIL ELLIS LOWERY,
MINNIE MAE LOWERY, EDDIELENE
GAIL LOWERY BROWN, and ARNETT
LEE JR., individually and on behalf of
others similarly situated,

     Plaintiffs,

v.

UBER TECHNOLOGIES, INC., and
LYFT, INC.,

     Defendants.

_____/

**CLASS ACTION**

JURY TRIAL DEMANDED

## CLASS ACTION COMPLAINT

The Plaintiffs, MIADECO CORP., a Florida Corporation, B & S TAXI CORP., a Florida

Corporation, CHECKER CAB OPERATORS, INC., a Florida Corporation, and PHIL ELLIS

LOWERY, MINNIE MAE LOWERY, EDDIELENE GAIL LOWERY BROWN, and ARNETT

LEE JR.,  individually and on behalf of others similarly situated, by and though the undersigned

counsel, hereby file this Class Action Complaint against the Defendants, UBER

TECHNOLOGIES, INC. a (hereinafter, "UBER") and LYFT, INC., (hereinafter "LYFT").

Plaintiffs seek damages, including declaratory and compensatory relief, costs of suit and

attorney's fees. In support, Plaintiffs and the putative class allege as follows:

## JURISDICTION & VENUE

1.      This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.), because the amount in controversy exceeds $5 million and diversity exists between Plaintiffs, the putative class, and Defendants. *See* 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5,000,000 and there are at least one hundred members of the putative class. Further, in determining whether the $5 million amount in controversy requirement of 28 U.S.C. § 1332(d)(2) is met, the claims of the putative class members are aggregated. *See* 28 U.S.C. § 1332(d)(6). This Court also has supplemental jurisdiction over related state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to other claims in this action that they form part of the same case or controversy.

2.      The Court has personal jurisdiction over the Defendant, UBER, because it is a Delaware corporation registered with the Florida Secretary of State to conduct business in Florida, is doing business in Florida, or does sufficient business in Florida, has sufficient minimum contacts with Florida, or has otherwise intentionally availed itself of the Florida market. This purposeful availment renders the exercise of jurisdiction by this Court over UBER permissible under traditional notions of fair play and substantial justice. Moreover, UBER is engaged in substantial and not isolated activity within this state.

3.      The Court has personal jurisdiction over the Defendant, LYFT, through the application of Fla. Stat. § 48.193, Florida's Long Arm Statute, because LYFT is a Delaware corporation doing business in Florida that has sufficient minimum contacts with Florida, or that otherwise intentionally availed itself of the Florida market. This purposeful availment

renders the exercise of jurisdiction by this Court over LYFT permissible under traditional notions of fair play and substantial justice. Moreover, LYFT is engaged in substantial and not isolated activity within this state.

4.  Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because Defendants UBER and LYFT transact business and may be found in this District. Venue is also proper here because at all times relevant hereto, a substantial portion of the practices complained of herein occurred in the Southern District of Florida, and Defendants have caused harm to Plaintiffs and members of the putative class in this District.

5.  All conditions precedent to this action have occurred, been performed, or have been waived.

## PARTIES – PLAINTIFFS

6.  Plaintiff MIADECO CORP. is a Florida corporation doing business in Miami-Dade County, Florida. It owns one hundred-fifteen (115) for-hire licenses in Miami-Dade County, and has been injured by the devaluation of its for-hire licenses as a direct result of the unauthorized and illegal provision of for-hire transportation services by the Defendants.

7.  Plaintiff B & S TAXI CORP. is a Florida corporation doing business in Miami-Dade County, Florida. It owns nineteen (19) for-hire licenses in Miami-Dade County, and has been injured by the devaluation of its for-hire licenses as a direct result of the unauthorized and illegal provision of for-hire transportation services by the Defendants.

8.  Plaintiff CHECKER CAB OPERATORS, INC. is a Florida corporation doing business in Miami-Dade County, Florida. It owns five (5) for-hire licenses in Miami-Dade County,

and has been injured by the devaluation of its for-hire licenses as a direct result of the unauthorized and illegal provision of for-hire transportation services by the Defendants.

9.   Plaintiff PHIL ELLIS LOWERY is a resident of Miami-Dade County, Florida, is *sui juris*, owns one (1) for-hire license, and has been injured by the devaluation of his for-hire license as a direct result of the unauthorized and illegal provision of for-hire transportation services by the Defendants.

10.  Plaintiff MINNIE MAE LOWERY is a resident of Miami-Dade County, Florida, is *sui juris*, owns two (2) for-hire licenses, and has been injured by the devaluation of her for-hire licenses as a direct result of the unauthorized and illegal provision of for-hire transportation services by the Defendants.

11.  Plaintiff EDDIELENE GAIL LOWERY BROWN is a resident of Miami-Dade County, Florida, is *sui juris*, owns one (1) for-hire license, and has been injured by the devaluation of her for-hire license as a direct result of the unauthorized and illegal provision of for-hire transportation services by the Defendants.

12.  Plaintiff ARNETT LEE JR. is a resident of Miami-Dade County, Florida, is *sui juris*, owns one (1) for-hire license, and has been injured by the devaluation of his for-hire licenses as a direct result of the unauthorized and illegal provision of for-hire transportation services by the Defendants.

## PARTIES - DEFENDANTS

21.  The Defendant, UBER, is a Delaware corporation registered with the Florida Secretary of State and authorized to conduct business in Florida. Pursuant to definitions set forth in section 31 of the Miami-Dade County Code of Ordinances ("MDCCO"), UBER is a passenger service company that provides for-hire transportation services to consumers in

Miami-Dade County through the use of a smartphone application designed to act as a means to dispatch its drivers to customers through internet communications, and then thereafter receives a portion of all profits rendered by said drivers.

22.    The Defendant, LYFT, is a Delaware corporation that is not registered with the Florida Secretary of State and who is therefore, not authorized to conduct business in Florida. Pursuant to the definitions set forth in section 31 of the MDCCO, LYFT is a passenger service company that provides for-hire transportation services to consumers in Miami-Dade County through the use of a smartphone application designed to act as a means to dispatch its drivers to customers through internet communications, and then thereafter receives a portion of all profits rendered by said drivers.

### CLASS DEFINITION

23.    Plaintiffs and the putative class bring this action against Defendants, UBER and LYFT, pursuant to Rules 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, seeking declatory and/or compensatory relief on behalf of themselves and all other person and/or entities similarly situated. Plaintiffs seek to represent the following putative class:

   a.    All persons or entities holding for-hire licenses in Miami-Dade County and operating an authorized for-hire transportation service pursuant to section 31 of the MDCCO.

### INTRODUCTION

24.    The American way of life is built upon a strong respect for the rule of law, which is grounded in the perception that laws will be upheld when they are violated – regardless of the identity of the entity responsible for such violations.

25.     This case arises from the unauthorized and illegal for-hire transportation service operations of UBER & LYFT in Miami-Dade County, Florida ("Miami-Dade County") and the tortious effect that such operations have inflicted upon the Plaintiffs and the putative class. It seems only natural then to expect that both UBER and LYFT will be held accountable in a court of law for the very real damages they have inflicted upon the Plaintiffs and putative class in Miami-Dade County.

## FACTUAL ALLEGATIONS

### A. DEFINITIONS.

26.     The MDCCO defines "for-hire" as "driving, operating, or managing a for-hire passenger motor vehicle . . . ." in Miami-Dade County. MIAMI-DADE COUNTY, FL, Code § 31-81(r) (2014).

27.     The MDCCO defines a "chauffeur" as "a duly licensed driver registered with and authorized by the Consumer Services Department to operate a for-hire passenger motor vehicle." MIAMI-DADE COUNTY, FL, Code § 31-81(d) (2014).

28.     The MDCCO defines a "chauffeur's agreement" as "the CSD approved form agreements entered into by the chauffeur and the passenger service company and the chauffeur and the for-hire license holder prior to the provision of any for-hire service." MIAMI-DADE COUNTY, FL, Code § 31-81(e) (2014).

29.     The MDCCO defines "passenger service company" as a " . . . Florida corporation or partnership created for the purpose of providing passenger services for for-hire taxi operations and providing various services to for-hire license holder(s) and chauffeurs with whom the passenger service company has entered into passenger service agreements." MIAMI-DADE COUNTY, FL, Code § 31-81(s) (2014).

30.     The MDCCO defines a "passenger service agreement" as ". . . the CSD approved form agreement entered into by the for-hire license holder and the passenger service company prior to any for-hire operation." *See* MIAMI-DADE COUNTY, FL, Code § 31-81(x) (2014).

31.     In Miami-Dade County, a passenger service company must:

    a.  Have a passenger service agreement with each individual for-hire license holder or entity for each for-hire vehicle it operates; and

    b.  Have a chauffer's agreement with each chauffeur who operates or drives a for-hire vehicle for which the passenger service company provides passenger services.

## B. OPERATION AND REGULATION OF FOR-HIRE TRANSPORTATION SERVICES AND PASSENGER SERVICE COMPANIES IN MIAMI-DADE COUNTY.

32.     Originally subject to inconsistent oversight from cities and localities, the for-hire transportation industry came to be uniformly regulated by Miami-Dade County in 1981.

33.     Today, all regulations relevant to for-hire transportation in Miami-Dade County are contained in section 31 of the MDCCO and industry oversight is conducted by the Miami-Dade County Consumer Services Department ("MDCCSD"), and enforced by the MDCCSD personnel, police forces of various municipalities in Miami-Dade County, and by the Miami-Dade Police Department.

34.     The for-hire transportation industry in Miami-Dade County operates under the "[m]edallion [s]ystem . . . which deems a taxicab for-hire license to be intangible property." *See* MIAMI-DADE COUNTY, FL, Code § 31-81(aa) (2014).

35. The MDCCO defines "for-hire" as "driving, operating, or managing a for-hire passenger motor vehicle" in Miami-Dade County. *See* MIAMI-DADE COUNTY, FL, Code § 31-81(r) (2014).

36. In Miami-Dade County, the terms "medallion" and "for-hire license" are interchangeable.

37. The MDCCO defines a "for-hire license" as "an annual, renewable license . . . which authorizes the provision of for-hire transportation services and which may expire, be suspended or revoked." *See* MIAMI-DADE COUNTY, FL, Code § 31-81(q) (2014).

38. Plaintiffs and members of the putative class are authorized and regulated for-hire license holders in Miami-Dade County.

39. The total amount of for-hire licenses in Miami-Dade County are capped, and small amounts of new licenses are occasionally auctioned off in a lottery.

40. All for-hire licenses are eligible to be resold, or are capable of lapsing, and upon information and belief, the secondary fair market value of a for-hire license in January of 2014 was approximately $340,000.00.

41. In Miami-Dade County, a for-hire license holder may provide for-hire transportation services:

    a. As a chauffeur who holds the license him/herself; or

    b. Through a passenger service company.

42. For-hire license holders in Miami-Dade County, whether an individual or an entity, must comply with regulations including, but not limited to:

    a. A for-hire license/medallion for each vehicle;

    b. Submission to regular background checks;

8

    c. Possession of approved automobile insurance secured from a member of the Florida Insurance Guarantee Association;

    d. Passing regular vehicle inspections;

    e. Possession of a chauffeur's registration license for each driver;

    f. Possession of a passenger service company license, if applicable;

    g. Adherence to established fare payment rates;

    h. If the for-hire vehicle is wheelchair accessible, proper training and certification in the safe and proper methods of securing, transporting, and dealing with the passengers utilizing a wheelchair;

43. Miami-Dade County explicitly forbids the operation of for-hire vehicles without for-hire licenses, stating that:

> It shall be unlawful for any person to use, drive or operate, or to advertise in any newspaper, airwave transmission, telephone directory or other medium accessible to the public that it offers for-hire services, or to cause or permit any other person to use, drive or operate any for-hire motor vehicle upon the streets of Miami-Dade County without first obtaining a Miami-Dade County for-hire license . . .

MIAMI-DADE COUNTY, FL, Code § 31-82(a) (2014).

44. The MDCCO defines "passenger service company" as a "Florida corporation or partnership created for the purpose of providing passenger services for for-hire taxi operations and providing various services to for-hire license holder(s) and chauffeurs with whom the passenger service company has entered into passenger service agreements." *See* MIAMI-DADE COUNTY, FL, Code § 31-81(s) (2014).

45. The MDCCO explicitly requires that passenger service companies possess for-hire licenses for all individual entities acting on its behalf.

9

46.   A passenger service company's functions are defined in section 31 of the MDCCO, and

consist of:

> [P]roviding for-hire vehicle color schemes and markings;
> providing two-way radio or cellular telephone dispatch services,
> maintenance and advertising of a telephone number for receiving
> all calls related to for-hire taxi services; handling passenger
> complaints and passenger lost and found; [and maintaining] a
> properly listed telephone for receiving all calls relating to for-hire
> vehicle service.

*See* MIAMI-DADE COUNTY, FL, Code § 31-100(b) (2014)

47.   Miami-Dade County also strictly and explicitly forbids the operation of a passenger

service company without authorization from a for-hire license holder, stating that "No

person or entity shall provide taxicab passenger services on behalf of a for-hire license

holder without such person or entity first obtaining a Miami-Dade County Passenger

Service Company registration." MIAMI-DADE COUNTY, FL, Code § 31-100(a) (2014).

48.   To legally operate in Miami-Dade County as a passenger service company, an entity must

comply with MDCCO requirements including, but not limited to:

a.   Securing individual written passenger service agreements with individual for-
hire license holders for each vehicle operated by the passenger service
company;

b.   Securing of chauffeur's agreements with each chauffeur who operates or
drives a for-hire vehicle for the passenger service company;

c.   Payment of a registration fee;

d.   Ensuring that each vehicle it operates, or allows to be operated, is insured by a
member of the Florida Insurance Guarantee Association;

      e. Maintaining a quality assurance program including regular training for all affiliated chauffeurs;

      f. Providing a radio or cellular telephone dispatch system.

49. Section 31 of the MDCCO was/is implemented to protect the health, welfare, and safety of the public. These requirements serve a reasonable and rational public policy basis as follows:

      a. Issuance of chauffeur's registration licenses requires all drivers to submit their personal information for a criminal background check conducted by Miami-Dade County and to a medical examination, all in the interest of ensuring the public of consistent standards of professional service. As an additional safety measure, chauffeur's licenses are required to be prominently displayed on the dashboard of all for-hire vehicles thereby providing the public with easy access to the name, and all other pertinent information of the driver;

      b. Licensing of passenger service companies and for-hire license holders assures the public of minimum responsible corporate and individual standards, including appropriate complaint systems and lost-and-found procedures such that an individual can have immediate redress in the event of loss or injury;

      c. All for-hire vehicles are required to be inspected quarterly by the MDCCSD to assure the vehicles meet minimum safety standards, including, but not limited to, working windshield wipers, functional safety belts, functioning air conditioning, functioning windows and door locks, properly inflated tires, etc.;

      d. All for-hire vehicles are required to carry insurance coverage through an insurance company that is a member of the Florida Insurance Guaranty

Association (hereinafter, "FIGA") to guarantee that all individuals who are injured as a result of the for-hire operations will be properly compensated even if the insurer becomes insolvent. FIGA will pay the injured party in such an event. Further, Miami-Dade County requires the named insureds to be the passenger service company, the for-hire license holder, the vehicle owner, and the chauffeur, for all activities, thereby eliminating coverage loopholes for the benefit of the the public; and

    e. An established fare schedule including meter rates and/or flat rates provides the riding public with full disclosure and knowledge of the approximate amount of each ride. These measures protect the public from unanticipated surge pricing and price-gouging.

50.    Plaintiffs and members of the putative class are authorized for-hire license holders in Miami-Dade County.

51.    In Miami-Dade County, members of the riding public can hail one of the Plaintiffs' or putative class's authorized for-hire vehicles on the street, use a cell-phone to summon a ride, or go online to arrange travel.

52.    Although the members of the riding public never exchange formal written contracts with authorized for-hire license holders, members of the riding public do enter into de-facto contracts and business relationships, whereby the customer is transported to a desired location and, in exchange, agrees to pay the published rate for the trip.

## C. UBER AND LYFT BEGIN OPERATING IN MIAMI-DADE COUNTY.

53.    Defendants UBER and LYFT are **passenger service companies** within the meaning of the MDCCO, operating across the United States in interstate commerce, who hire drivers

12

to provide for-hire transportation services to consumers through the use of a smartphone application, and who receive a portion of all profits rendered by said drivers. At no point have they attempted to, or have they received any form of licensure from Miami-Dade County.

54.     UBER and LYFT utilize their smartphone applications as a means to dispatch their drivers to customers through internet communications

55.     When using UBER or LYFT, members of the public enter into contracts and business relationships through smartphone apps whereby they locate, schedule and summon UBER or LYFT drivers, who then conduct for-hire transportation services for the member of the public by transporting them to a desired location in exchange for credit card payments through the smartphone apps. On certain occasions, including times of high volume or inclement weather, these fares can be doubled, tripled or multiplied exponentially by what is known as surcharge pricing.  Once the payment is made, depending on the service used, UBER or LYFT, then take a share of the fare, and remit the remaining percentage back to the driver.

56.     Despite full knowledge that Miami-Dade County requires individual for-hire licenses for each automobile that a passenger service company uses to conduct for-hire transportation services, UBER, and LYFT, intentionally failed to secure passenger service agreements and/or chauffeur's agreements wherein they would secure a for-hire license in satisfaction of said applicable laws, and began operations in Miami-Dade County as a passenger service company without the necessary for-hire licenses for each vehicle in approximately June of 2014.

57. Upon information and belief, Miami-Dade County responded to UBER and LYFT's arrival by ticketing UBER and LYFT drivers, and by impounding both UBER and LYFT vehicles.

58. Upon information and belief, numerous citations have been issued against the Defendants, UBER and LYFT, since they began operating in Miami-Dade County.

59. Upon information and belief, UBER and LYFT have reimbursed their drivers for fines associated with violations of MDCCO, and have also agreed to provide drivers with legal representation for all potential violations in Miami-Dade County.[1]

60. To date, upon information and belief, neither UBER nor LYFT have complied with any applicable regulations regarding passenger service companies.

61. Instead, upon information and belief, the unauthorized and illegal for-hire operations are a part of the both UBER and LYFT's express business plan. In response to ticketing from Miami-Dade County, LYFT representatives have been quoted as saying:

> We have received reports that local Lyft drivers have recently received citations in Miami. In all cases, we have responded immediately to provide support and we are also covering the cost of the citations and any necessary legal assistance. Throughout this process, we commit to standing strong with drivers and passengers every step of the way, fighting any citations, covering relevant costs, and making policy progress.[2]

62. In other words, Defendants UBER and LYFT have flaunted the laws regulating for-hire transportation services in Miami-Dade County and acted as if their status as venture-capital funded, silicon-valley based entities places them above the laws as promulgated by Miami-Dade County.

---

[1] Camila Souza, Fines Won't Keep Uber and Lyft Down in Miami, TECH COCKTAIL MIAMI (June 6, 2014) http://tech.co/uber-lyft-miami-fines-2014-06.

[2] *Id.*

63.    Both UBER and LYFT are multi-billion dollar corporations, with the resources to operate within the laws that are set out regarding passenger service companies and for-hire transportation services in Miami-Dade County; however, in Miami-Dade County, like many other locations across the country such as Broward County, Florida, Palm Beach County, Florida, Atlanta, Georgia, Houston, Texas, and Las Vegas, Nevada, both UBER and LYFT have knowingly and intentionally chosen to operate outside the laws set forth regarding passenger service companies and for-hire transportation services as set forth in section 31 of the MDCCO.

64.    The unauthorized and illegal for-hire transportation service operations by UBER and LYFT in Miami-Dade County have diluted the for-hire transportation market in Miami-Dade County and thus have significantly devalued the for-hire licenses held by the Plaintiffs and putative class. As a direct result, the Defendants UBER and LYFT have inflicted extensive damages upon the Plaintiffs and putative class, which are detailed herein in an effort for redress.

**D. BUSINESS PRACTICES OF UBER AND LYFT.**

65.    To obtain consumer support for their unauthorized and illegal operations and enter the market without compliance with applicable regulations, Defendants UBER and LYFT have engaged in a repeated pattern of deceit toward customers regarding their business models, legality and types of services and drivers they provide.

66.    Through its website, blog and Twitter accounts, UBER has consistently misled the public as to its compliance with local ordinances. Specifically, on its website, UBER tells consumers that:

> The specifics vary depending on what local governments allow, but within each city we operate, we aim to go above and beyond

local requirements to ensure your comfort and security - what we're doing in the US is an example of our standards around the world. The specifics vary depending on what local governments allow, but within each city we operate, we aim to go above and beyond local requirements to ensure your comfort and security - what we're doing in the US is an example of our standards around the world.[3]

67.    This statement is false, as it implies that UBER meets and exceeds all applicable regulations, while in fact, they have failed even to comply with the minimum provisions set forth in section 31 of the MDCCO regarding passenger service companies.

68.    Moreover, on its own website, UBER expressly acknowledges the illegal business model of LYFT and its drivers, and similar misnamed "ridesharing" transportation services, and then explains that **they will do the same thing in an effort to compete with LYFT and other unlicensed for-hire transportation providers.**[4] UBER further admits that it and LYFT are betting that "[r]egulators for the most part will be unable to act or enforce in time to stop them before they have a critical mass of consumer support."[5]

69.    For its part, LYFT misrepresents that it operates a lawful business in Miami by representing on its website that drivers are required to follow state and local regulations. Specifically, LYFT's terms of services state that its drivers have "all appropriate licenses, approvals, and authority to provide transportation to third parties in all jurisdictions in which such [d]river uses the [s]ervices."[6]

70.    Upon information and belief, to date, neither UBER nor LYFT have complied with any regulations regarding for-hire license holders or passenger service companies.

---

[3] Safest Rides on the Road: Going the Distance to Put People First, UBER, https://www.uber.com/safety (last visited Jan. 15, 2015).
[4] See *id* (emphasis added).
[5] *Id.*
[6] Lyft Terms of Service, LYFT (December 22, 2014) https://www.lyft.com/terms.

### i.    UBER and LYFT are not "Ridesharing" Services

71.    UBER and LYFT brand their operations as "ridesharing" in an effort to avoid regulation. In doing so, they market themselves to the public as something they are not.

72.    The term "[r]idesharing" itself is a noun and is defined as the "act or an instance of sharing motor vehicle transportation with another or others, especially among commuters."[7] It is traditionally understood that ridesharing constitutes arrangements such as car pools or van pools, where costs are shared amongst all participants, including the operator of the vehicle.

73.    In truth, the Defendants, UBER and LYFT, offer on-demand for-hire transportation services for compensation in Miami-Dade County, and should be classified as passenger service companies.

74.    UBER describes itself as a ridesharing company that is "offering transportation services without traditional commercial insurance or licensing."[8] UBER's self-serving description notwithstanding, both UBER and LYFT are for-profit companies that charge fares to customers in exchange for the provision of for-hire transportation services, and whose primary goals are in profiteering, not simply in recovering the costs of the trips provided to for-hire customers.

75.    UBER's primary profiteering operations are evidenced on its website, which provides a coverage map for Miami, FL that includes rates for "Base Fare," "Per Minute," and "Per Mile" costs as well as a "Min Fare," and a "Cancellation Fee."[9]

---

[7] *See* The American Heritage® Dictionary of the English Language, Fifth Edition copyright @2013 by Houghton Mifflin Harcourt Publishing Company.
[8] Travis, Uber Policy White Paper: 1.0, UBER (April 12, 2013), http://blog.uber.com/2013/04/12/uber-policy-white-paper-1-0/.
[9] Miami, UBER, https://www.uber.com/cities/miami (last visited 1/15/2015).

76.     Similarly, LYFT's website also advertises pricing for the Miami market, including "Base Charge," "Per Minute," "Per Mile," "Cancel Penalty," and a "Cost Minimum." LYFT's per mile cost in Miami is $1.10, nearly double the IRS standard mileage rate for reimbursement for use of a vehicle, and which, upon information and belief, exceeds the actual cost of operation of the vehicle."[10] Moreover, LYFT has even structured its search engine results on Google to show "Lyft Miami - Rideshare, taxi & cab alternative."[11]

77.     In *Metropolitan Taxicab Commission v. Lyft Inc. et. al.*, a similar action in St. Louis, Missouri, the court there found that:

> Lyft argues that it is a "ridesharing service," equivalent to a carpooling arrangement. It markets itself as"[y]our friend with a car." The evidence produced at the hearing on the Motion for Preliminary Injunction, however, fails to show a common purpose or goal between the driver and passenger. The driver is driving from point A to point B based on the orders of the passenger. The driver is driving from point A to point B to make a profit. [12]

> *Metropolitan Taxicab Commission v. Lyft Inc. et. al.*, Cause No. 1422-CC00890-01 (Mo. Cir. Ct. July 14, 2014)(findings of fact, conclusions of law, and preliminary injunction).

78.     LYFT's profiteering goals are no less transparent in Miami-Dade County than they are in St. Louis, as its platform in Miami-Dade County allows for-hire customers to summon for-hire drivers via the smartphone application, who then charge based on time and distance. Like in St. Louis, this cannot be described as ridesharing, and instead fits well within the definition of for-hire transportation.

---

[10] INTERNAL REVENUE SERVICE, 2014 Standard Mileage Rates (2014), *available at* http://www.irs.gov/2014-Standard-Mileage-Rates-for-Business,-Medical-and-Moving-Announced.

[11] Lyft Miami, GOOGLE, https://www.google.com/webhp?sourceid=chrome-instant&ion=1&espv=2&ie=UTF-8#q=lyft%20miami (type "Lyft Miami" into the search prompt).

79.     Despite the fact that neither UBER nor LYFT are ridesharing participants, neighborhood carpools, or good samaritans, both corporations continue grossly to misrepresent the nature of their services to disguise, deceive, and confuse the public and to further their profiteering goals.

80.     Defendants' misrepresentations that they provide ridesharing services are a clear effort to sway consumers of taxi services to use their services to the detriment of Plaintiffs and the putative class, because Plaintiffs and the putative class are in fact the only authorized providers of for-hire transportation services in Miami-Dade County.

81.     The illegal and unauthorized for-hire transportation service operations by UBER and LYFT have diluted the for-hire transportation market in Miami-Dade County, and thus diminished the value of for-hire licenses held by the Plaintiffs and the putative class in the same area.

82.     Because the operations of UBER and LYFT are ongoing, Plaintiffs and members of the putative class have been, and will continue to be, damaged by these misrepresentations.

**ii.     Uber's Claim That its Drivers are "Partners"**

83.     UBER misrepresents to the public the relationship that exists between UBER and its drivers. UBER's marketing efforts seek to entice both passengers and drivers by referring to drivers as "[p]artners" in an attempt to cast themselves as a small business and gain traction with community-minded individuals. [13]

84.     UBER's website declares that "UBER partners with drivers."[14] Prospective drivers are told by UBER that "[w]hen you partner with Uber, we've got your back."[15] Further,

---

[13] Uber Needs Partners Like You, UBER, http://www.uber.com/drive (last visited Jan. 15, 2015).
[14] Id.
[15] See Drive With Uber – Earn Cash With Your Car! (Full Time), UBER, http://blog.uber.com/partnersfulltime (last visited Jan. 15, 2015).

UBER uses quotes from drivers in its advertising in an attempt to compound the competitive advantage it gains from operating illegally by claiming that it is safer "partnering" with UBER as an alternative to taxis.[16]

85.   In stark contrast to the promises of a partnership relationship and the numerous public representations claiming the existence of partnership between UBER and its drivers, under UBER's terms of service, UBER drivers are labeled as "third party transportation providers" and UBER attempts to disclaim all responsibility for the actions of said "third party transportation providers."[17]

86.   Because the drivers cannot simultaneously be "third party transportation providers" and UBER "partners" one of these statements must be false.

87.   To the extent these representations are indeed false and the drivers are in fact not UBER partners, UBER is utilizing this misrepresentation to entice drivers and passengers to join and use its illegal and unauthorized for-hire transportation service operations because they believe such statements will result in a heightened confidence in their drivers, thus forming a competitive advantage against its competitors, the legal and regulated for-hire transportation service providers, *i.e.* the Plaintiffs and the putative class.

### iii.   Insurance Coverage

88.   UBER and LYFT misrepresent their available insurance coverage in an attempt to lure customers to their service and undermine the business of Plaintiffs and putative class.

---

[16] Safest Rides on the Road: Going the Distance to Put People First, UBER, https://www.uber.com/safety (last visited Jan. 15, 2015).
[17] *See* Legal, UBER, https://www.uber.com/legal/usa/terms (last visited Jan. 15, 2015).

### (a) UBER

89.   UBER represents that "[a]t minimum, there will be a $1,000,000 per-incident insurance policy applicable to ridesharing trips. This insurance applies to any ridesharing trip requested through the Uber technology platform."[18]

90.   However, upon information and belief, UBER's coverage is illusory. The policy that UBER discloses on its website, appears to be an excess and surplus lines policy, whose market is subject to a bare minimum of insurance regulation as opposed to traditional personal, for-hire or commercial auto insurance policy, which are heavily regulated by State authorities for pricing, policy scope and language and unfair claim settlement protections.

91.   Further, upon information and belief, UBER's insurer, James River Insurance Company is not authorized to issue insurance in the form of commercial auto liability coverage in the State of Florida.

92.   Nevertheless, even if the James River Insurance Company was authorized to offer said insurance, it appears that there would be no coverage under the policy because it actually insures Rasier LLC, an apparent subsidiary company of UBER and an entity largely unknown to the end user of UBER's services. It appears that the coverage in the policy is only applicable if Rasier LLC is found liable to the third party for the injuries sustained in the accident.

93.   Given the role of Rasier LLC in the process of retaining and operating UBER's passenger service company operation, it is difficult to imagine how a driver or a passenger would be able to prove that Rasier LLC was responsible for the injuries sustained in an accident.

---

[18] Travis, Uber Policy White Paper: 1.0, UBER (April 12, 2013), http://blog.uber.com/2013/04/12/uber-policy-white-paper-1-0/.

Their insurance policy requires an injured victim to pierce the corporate veil merely to find coverage.

94.     Yet, UBER says on its website:

> From the moment you get into any Uber product (e.g. uberX, UberBLACK) to the moment you're dropped off, your ride is covered by commercial liability insurance. That goes for every trip in every city around the world. In the U.S. specifically, ridesharing has become a popular choice — and Uber is the first company to ensure true end-to-end insurance coverage for ridesharing, with drivers on uberX protected by liability coverage even between trips.[19]

95.     In truth, most, if not all personal automobile insurance policies exclude coverage for commercial operations. Nevertheless, UBER continues to make comparisons between itself and the for-hire license holders in Miami-Dade County.

### (b) LYFT

96.     LYFT claims "From background checks to our first-of-its kind $1,000,000 liability insurance, we go above and beyond to create a more safe community."[20]

97.     However, instead of publicly disclosing the full contents of its insurance policy, LYFT has only disclosed a one (1) page declaration page that leaves out the actual policy language. Upon information and belief, the LYFT insurance policy has also been misrepresented in that LYFT is believed to maintain similar polices as UBER and is believed to use the same insurer, James River Insurance Company, which is not authorized to issue insurance in the form of commercial automobile liability coverage in the state of Florida.

---

[19] Safest Rides on the Road: Going the Distance to Put People First, UBER, https://www.uber.com/safety (last visited Jan. 15, 2015).
[20] We Go The Extra Mile For Safety, LYFT, http:www.lyft.me/safety (last visited Jan. 15, 2015).

98.     Yet, even if the James River Insurance Company was so authorized, it appears there would be no coverage under the policy. Nevertheless, LYFT routinely compares its alleged insurance to that of taxicabs, claiming to have more coverage.

99.     Upon information and belief, Defendants' misrepresentations deceive and confuse the public and are meant to serve as a basis for permitting UBER and LYFT to continue their unregulated operation. If the public knew that UBER and LYFT had illusory insurance coverage there would be an outcry to require their regulation.

100.    As a result, both UBER and LYFT have received the benefit of sales and profits that they should not have, absent their material misrepresentations.

### iv.     Disclaimers - Illusory Insurance Coverage

101.    Whatever insurance UBER and/or LYFT actually has is mooted by disclaimers of all responsibility (contrary to their marketing), with the following broad disclaimers in addition to others more fully discussed below:

UBER:

> The quality of the transportation services requested through the use of the Application or the Service is entirely the responsibility of the Transportation Provider who ultimately provides such transportation services to you. Uber under no circumstance accepts liability in connection with and/or arising from the transportation services provided by the Transportation Provider or any acts, actions, behavior, conduct, and/or negligence on the part of the Transportation Provider. Any complaints about the transportation services provided by the Transportation Provider should therefore be submitted to the Transportation Provider.[21]

LYFT:

> Lyft has no responsibility whatsoever for the actions or conduct of drivers or riders. Lyft has no obligation to intervene in or be involved in any way in disputes that may arise between drivers, riders, or third parties. Responsibility for the decisions you make

---

[21] Legal, UBER, https://www.uber.com/legal/usa/terms (last visited Jan. 15, 2015).

regarding providing or accepting transportation rest solely with You. It is each rider and driver's responsibility to take reasonable precautions in all actions and interactions with any party they may interact with through use of the services. Lyft may but has no responsibility to screen or otherwise evaluate potential riders or users. Users understand and accept that Lyft has no control over the identity or actions of the riders and drivers, and Lyft requests that users exercise caution and good judgment when using the services. Drivers and riders use the services at their own risk.[22]

102.   UBER and LYFT strategically bury these legal disclaimers in the fine print of their smartphone consummated contracts with members of the public, and are used by them to defend against claims of liability by persons injured by UBER and LYFT drivers. As a result, even if it is technically true that they have insurance policies with policy limits of $1,000,000.00, coverage is limited to what UBER and LYFT would be liable for in the case of an injury, and based on the disclaimers, that liability could be severely limited or non-existent.

103.   UBER and LYFT are trying to have their cake and eat it too; on the one hand, both UBER and LYFT publicly pronounce that they comply with all applicable rules and regulations including required insurance coverage, but then once in litigation, both entities take advantage of their illegal, unregulated status to defend themselves.

**v.      No insurable interest**

104.   Finally, pursuant to Fla. Stat. 627.405(1), in order for UBER and LYFT's insurance to be enforceable or active with respect to the activities of their drivers/third party providers, there must exist an insurable interest held by UBER and LYFT. The purpose of the insurable interest requirement is to discourage the use of insurance for illegitimate purposes.

---

[22] Lyft Terms of Service, LYFT (December 22, 2014) https://www.lyft.com/terms.

105.    To find an insurable interest in an automobile under a liability insurance policy, UBER

and LYFT would have to establish an "actual, lawful and substantial economic interest"

in the vehicle. *See* Fla. Stat. § 627.405(2).

106.    Moreover, "[t]he measure of an insurable interest in property is the extent to which the

insured might be damnified by loss, injury, or impairment thereof." *See* Fla. Stat. §

627.405(3).

107.    It would seem that this would be a burden that UBER and LYFT would readily meet

when considering their repeated professions of concern for the safety and welfare of the

public. Unfortunately, a brief review of some of the terms and conditions found buried in

the fine print of UBER and LYFT's terms of service, over and above the disclaimers

already mentioned above, proves instructive:

UBER:

> YOU ACKNOWLEDGE THAT UBER DOES NOT PROVIDE
> TRANSPORTATION OR LOGISTICS SERVICES OR
> FUNCTION AS A TRANSPORTATION CARRIER. UBER'S
> SERVICES MAY BE USED BY YOU TO REQUEST AND
> SCHEDULE TRANSPORTATION OR LOGISTICS SERVICES
> WITH THIRD PARTY PROVIDERS, **BUT YOU AGREE**
> **THAT UBER HAS NO RESPONSIBILITY OR LIABILITY**
> **TO YOU RELATED TO ANY TRANSPORTATION OR**
> **LOGISTICS PROVIDED TO YOU BY THIRD PARTY**
> **PROVIDERS THROUGH THE USE OF THE SERVICES**
> **OTHER THAN AS EXPRESSLY SET FORTH IN THESE**
> **TERMS.**
>
> . . .
>
> THE SERVICES ARE PROVIDED "AS IS" AND "AS
> AVAILABLE." UBER DISCLAIMS ALL REPRESENTATIONS
> AND WARRANTIES, EXPRESS, IMPLIED, OR STATUTORY,
> NOT EXPRESSLY SET OUT IN THESE TERMS, INCLUDING
> THE IMPLIED WARRANTIES OF MERCHANTABILITY,
> FITNESS FOR A PARTICULAR PURPOSE AND NON-
> INFRINGEMENT. IN ADDITION, UBER MAKES NO

REPRESENTATION, WARRANTY, OR GUARANTEE REGARDING THE RELIABILITY, TIMELINESS, QUALITY, SUITABILITY, OR AVAILABILITY OF THE SERVICES OR ANY GOODS OR SERVICES OBTAINED THROUGH THE USE OF THE SERVICES, OR THAT THE SERVICES WILL BE UNINTERRUPTED OR ERROR-FREE. YOU AGREE THAT THE ENTIRE RISK ARISING OUT OF YOUR USE OF THE SERVICES, AND ANY THIRD PARTY GOOD OR SERVICES OBTAINED IN CONNECTION THEREWITH, REMAINS SOLELY WITH YOU, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW.[23]

LYFT:

LYFT DOES NOT PROVIDE TRANSPORTATION SERVICES, AND LYFT IS NOT A TRANSPORTATION CARRIER. IT IS UP TO THE DRIVER OR VEHICLE OPERATOR TO DECIDE WHETHER OR NOT TO OFFER A RIDE TO A RIDER CONTACTED THROUGH THE LYFT PLATFORM, AND IT IS UP THE RIDER TO DECIDE WHETHER OR NOT TO ACCEPT A RIDE FROM ANY DRIVER CONTACTED THROUGH THE LYFT PLATFORM. ANY DECISION BY A USER TO OFFER OR ACCEPT TRANSPORTATION ONCE SUCH USER IS MATCHED THROUGH THE LYFT PLATFORM IS A DECISION MADE IN SUCH USER'S SOLE DISCRETION. LYFT OFFERS INFORMATION AND A METHOD TO CONNECT DRIVERS AND RIDERS WITH EACH OTHER, BUT DOES NOT AND DOES NOT INTEND TO PROVIDE TRANSPORTATION SERVICES OR ACT IN ANY MANNER AS A TRANSPORTATION CARRIER, AND HAS NO RESPONSIBILITY OR LIABILITY FOR ANY TRANSPORTATION SERVICES VOLUNTARILY PROVIDED TO ANY RIDER BY ANY DRIVER USING THE LYFT PLATFORM.

. . .

**SUCH DRIVER WILL BE SOLELY RESPONSIBLE FOR ANY AND ALL LIABILITY WHICH RESULTS FROM OR IS ALLEGED AS A RESULT OF THE OPERATION OF THE VEHICLE SUCH DRIVER USES TO TRANSPORT RIDERS, INCLUDING, BUT NOT LIMITED TO**

---

[23] Legal, UBER, https://www.uber.com/legal/usa/terms (last visited Jan. 15, 2015)(emphasis added).

## PERSONAL INJURIES, DEATH AND PROPERTY DAMAGES.[24]

108.    Because UBER and LYFT disavow all responsibility for transportation they arrange, which they can only do because they are unregulated, they are simply not able to meet the burden of proving they have an interest in the maintenance, possession, or use of the vehicles their purported insurance covers. They do not own the vehicles at issue, and claim they do not control their drivers. Therefore, UBER and LYFT have no insurable interest (or in UBER's case, Raiser, LLC has no insurable interest) in the vehicles of their third party providers. As a result, UBER and LYFT's insurance policies are illusory and of no effect, and their public advertisements extolling the extent of their insurance coverages are false.

109.    Defendants' representations about their illegal and unauthorized services are false. As a result, Defendants are reaping the benefits of these false advertisements by improperly promoting the benefits, characteristics of the unauthorized and illegal for-hire transportation services they provide as a passenger service company, to the detriment of members of the Plaintiffs and the putative class, as a result of the dilution of the for-hire transportation services market in Miami-Dade County and the resulting diminishment in value of for-hire licenses.

## CLASS ALLEGATIONS

### A. CLASS DEFINITIONS

110.    Plaintiffs and the putative class bring this action against Defendants, UBER and LYFT, pursuant to Rules 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil Procedure,

---

[24] Lyft Terms of Service, LYFT (December 22, 2014) https://www.lyft.com/terms (emphasis added).

seeking declatory and/or compensatory relief on behalf of themselves and all other person and/or entities similarly situated. Plaintiffs seek to represent the following putative class:

b. All persons or entities holding for-hire licenses in Miami-Dade County and operating an authorized for-hire transportation service pursuant to section 31 of the MDCCO.

111. Excluded from the putative class are the Defendants, their employees, agents, contractors, co-conspirators, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and judicial officers and their immediate family members and associated court staff assigned to this case.

112. Plaintiffs and the putative class reserve the right to modify or amend the definition of the proposed putative class before the Court determines whether certification is appropriate.

113. Plaintiffs' and the putative class's claims are appropriate for class-wide treatment because Plaintiffs' and the putative class can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

### B. NUMEROSITY

114. Members of the putative class are so numerous that joinder of all members would be impracticable. On information and belief, there are over 2,000 for-hire license holders in Miami-Dade County, Florida. The individual class members are also ascertainable, as the names and addresses of all class members can be identified in public records. Plaintiffs and the putative class do not anticipate any difficulties in the management of the action as a class action.

## C. **COMMONALITY**

115.   There are questions of law and fact that are common to all claims of Plaintiffs and the putative class. Among such questions of law and fact are the following:

   a.   Do UBER's operations in Miami-Dade County subject them to regulation by section 31 of the MDCCO as a passenger service company?;

   b.   Do LYFT's operations in Miami-Dade County subject them to regulation by section 31 of the MDCCO as a passenger service company?;

   c.   Do UBER's operations devalue the for-hire licenses, deemed to be intangible property by the MDCCO, which are held by the Plaintiffs and the putative class?;

   d.   Do LYFT's operations devalue the for-hire licenses, deemed to be intangible property by the MDCCO, which are held by the Plaintiffs and the putative class?;

   e.   By how much do UBER's operations devalue the for-hire licenses, deemed to be intangible property by the MDCCO, which are held by the Plaintiffs and the putative class?;

   f.   By how much do LYFT's operations devalue the for-hire licenses, deemed to be intangible property by the MDCCO, which are held by the Plaintiffs and the putative class?

   g.   Whether UBER holds, has applied for, or has otherwise attempted to acquire for-hire licenses in compliance with section 31 of the MDCCO?;

   h.   Whether LYFT holds, has applied for, or has otherwise attempted to acquire for-hire licenses in compliance with section 31 of the MDCCO?;

   i.   Whether UBER holds or carries the required insurance coverage pursuant to section 31 of the MDCCO?;

j.  Whether LYFT holds or carries the required insurance coverage pursuant to section 31 of the MDCCO?;

k.  What was the fair market value of a for-hire license when UBER began operating in Miami-Dade County?;

l.  What was the fair market value of a for-hire license when LYFT began operating in Miami-Dade County?;

m.  When did UBER begin operating in Miami-Dade County?;

n.  When did LYFT begin operating in Miami-Dade County?;

o.  Will irreparable harm to Plaintiffs and the putative class result from failure to enjoin the Defendant UBER from operating a passenger service company in violation of the rules of section 31 of the MDCCO?; and

p.  Will irreparable harm to Plaintiffs and the putative class result from failure to enjoin the Defendant LYFT from operating a passenger service company in violation of the rules of section 31 of the MDCCO?

## D. **TYPICALITY**

116.  Plaintiffs' claims are typical of the claims of the putative class members because proving the claims of one for-hire license holder will prove the claims of the entire putative class. The same evidence and legal rulings necessary to support the Plaintiffs' claims will necessarily establish the claims of the entire putative class.

117.  Plaintiffs are members of the class they seek to represent, and their claims are typical of the respective putative class's claims because of the similarity, uniformity, and common purpose of Defendants' unlawful conduct. Each member of the putative class has

sustained, and will continue to sustain, damages in the same manner as Plaintiffs as a result of the Defendants' wrongful conduct.

### E. ADEQUACY OF REPRESENTATION

118.   Plaintiffs' and the putative class are adequate representatives of the class they seek to represent and will fairly and adequately protect the interests of such class. Plaintiffs and the putative class are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in litigation of this nature, to represent them. There is no divergence of interest between Plaintiffs and the putative class members. Plaintiffs and their counsel anticipate no difficulty in the management of this litigation as a class action.

119.   To prosecute this case, Plaintiffs and the putative class have chosen the undersigned law firm, which is experienced in this type of litigation and has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

### F. REQUIREMENTS OF FED. R. CIV. P. 23(b)(2)

120.   UBER and LYFT have acted and/or refused to act on grounds that are generally applicable all members of the putative class, and final declatory relief concerning the class as a whole is therefore appropriate. In particular, both UBER and LYFT have conducted illegal and unauthorized for-hire transportation services as passenger service companies in Miami-Dade County, in violation of the laws set forth in section 31 of the MDCCO. Each of the Defendants' actions challenged herein affects each Plaintiff and member of the putative class in an identical fashion, namely by devaluing the for-hire licenses owned by Plaintiffs and members of the putative class.

## G. REQUIREMENTS OF FED. R. CIV. P. 23(b)(3)

### i.     PREDOMINANCE

121.  The questions of law or fact common to the Plaintiffs' and the putative class's claims predominate over any individual questions of law or fact. Because UBER and LYFT operate outside the parameters of section 31 of the MDCCO, all questions of law and fact pertaining to liability are common.

122.  Because this lawsuit is grounded on UBER and LYFT's operation of unauthorized and illegal for-hire transportation services, the only conceivable individual issues pertain to damages. It is well established that individual damages questions are not relevant to a Rule 23(b)(3) predominance analysis.

### ii.    SUPERIORITY

123.  A class action on behalf of the Plaintiffs and the putative class is superior to individual actions in part because of the non-exhaustive factors listed below:

a. Joinder of all putative class members would create extreme hardship and inconvenience for the affected for-hire license holders as they are extremely numerous and reside in different areas of Miami-Dade County;

b. There are no known individual members of the putative class who are interested in individually controlling the prosecution of separate actions;

c. The interests of justice will be well served by resolving the common disputes of potential members of the putative class in one forum;

d. Individual suits would not be cost effective or economically maintainable as individual actions;

e.  Individual suits would be difficult to manage because common legal rulings could not be applied to each individual suit; and

f.  The action is manageable as a class action.

## COUNT I: CLAIM FOR VIOLATIONS OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA"), Fla. Stat. § 501.201, *et seq.* BY UBER PURSUANT TO RULE 23(b)(2) AND 23(b)(3)

124.  Plaintiffs and the putative class re-allege and incorporate by reference the allegations contained in paragraphs one (1) through one hundred twenty-three (123) of this Complaint as if fully set forth herein and further allege as follows.

125.  This count is brought on behalf of the putative class.

126.  Plaintiffs and members of the putative class are for-hire license holders in Miami-Dade County. These for-hire licenses authorize the exclusive provision of for-hire transportation services within Miami-Dade County, and are defined as "intangible property," which qualifies them as chattel.

127.  Plaintiffs and members of the putative class are legitimate business enterprises within the meaning of FDUTPA.

128.  Defendant, UBER, is a passenger service company that has neither acquired, nor required its drivers to acquire for-hire licenses, but who still knowingly and intentionally provided, and continues to provide, unauthorized and illegal for-hire transportation services within Miami-Dade County.

129.  Defendant, UBER, is engaged in "trade or commerce" within the defined meaning of FDUTPA.

130.   FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." Fla. Stat. § 501.204(1) (2014).

131.   Violations of FDUTPA are explicitly defined as noncompliance with "any law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices." Fla. Stat. § 501.203(3)(c) (2014).

132.   Section 31 of the MDCCO is an ordinance within the meaning of FDUTPA which proscribes unfair methods of competition.

133.   Defendant, UBER, engaged in unfair and deceptive trade practices that violated FDUTPA as described herein:

   a.   Defendant, UBER, operated, and is operating, without the fees, costs, and qualifications associated with a licensed and authorized passenger service company pursuant to section 31 of the MDCCO, including, but not limited to intentionally failing to require:

      1.   Individual written passenger service agreements with individual for-hire license holders for each vehicle operated by the passenger service company;

      2.   Payment of a registration fee;

      3.   Ensuring that each vehicle it operates, or allows to be operated, is insured by a member of the Florida Insurance Guarantee Association;

      4.   Chauffeur's agreements with each chauffeur who operates or drives a for-hire vehicle for the passenger service company;

     5. The implementation of a quality assurance program including regular training for all affiliated chauffeurs;

    b. Defendant, UBER, operated, and continues to operate, as an unauthorized and illegal passenger service company in Miami-Dade County.

    c. Defendant, UBER, offered and performed, and continues to offer and perform, unauthorized and illegal for-hire transportation services for the Miami-Dade County riding public in exchange for money.

134.    UBER's unauthorized and illegal operations have diluted the for-hire transportation market in Miami-Dade County and damaged Plaintiffs and the putative class through the resulting diminishment in value of the for-hire licenses.

135.    Plaintiffs and the putative class seek damages, including all remedies for the diminishment in valuation of for-hire licenses in Miami-Dade County, attorney's fees, and all compensatory damages together with interest, costs, and any other just and proper relief available under FDUTPA.

**COUNT II: CLAIM FOR VIOLATIONS OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA"), Fla. Stat. § 501.201, *et seq*. BY LYFT PURSUANT TO RULE 23(b)(2) AND 23(b)(3)**

136.    Plaintiffs and the putative class re-allege and incorporate by reference the allegations contained in paragraphs one (1) through one hundred twenty-three (123) of this Complaint as if fully set forth herein and further allege as follows.

137.    This count is brought on behalf of the putative class.

138.    Plaintiffs and members of the putative class are for-hire license holders in Miami-Dade County. These for-hire licenses authorize the exclusive provision of for-hire

transportation services within Miami-Dade County, and are defined as "intangible property," which qualifies them as chattel.

139.  Plaintiffs and members of the putative class are legitimate business enterprises within the meaning of FDUTPA.

140.  Defendant, LYFT, is a passenger service company that has neither acquired, nor required its drivers to acquire for-hire licenses, but who still knowingly and intentionally provided, and continues to provide, unauthorized and illegal for-hire transportation services within Miami-Dade County.

141.  Defendant, LYFT, is engaged in "trade or commerce" within the defined meaning of FDUTPA.

142.  FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." Fla. Stat. § 501.204(1) (2014).

143.  Violations of FDUTPA are explicitly defined as noncompliance with "any law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices." Fla. Stat. § 501.203(3)(c) (2014).

144.  Section 31 of the MDCCO is an ordinance within the meaning of FDUTPA which proscribes unfair methods of competition.

145.  Defendant, LYFT, engaged in unfair and deceptive trade practices that violated FDUTPA as described herein:

    a.  Defendant, LYFT, operated, and is operating, without the fees, costs, and qualifications associated with a licensed and authorized passenger service

company pursuant to section 31 of the MDCCO, including, but not limited to intentionally failing to require:

1. Individual written passenger service agreements with individual for-hire license holders for each vehicle operated by the passenger service company;

2. Payment of a registration fee;

3. Ensuring that each vehicle it operates, or allows to be operated, is insured by a member of the Florida Insurance Guarantee Association;

4. Chauffeur's agreements with each chauffeur who operates or drives a for-hire vehicle for the passenger service company;

5. Maintaining a quality assurance program including regular training for all affiliated chauffeurs;

b. Defendant, LYFT, operated, and continues to operate, as an unauthorized and illegal passenger service company in Miami-Dade County.

c. Defendant, LYFT, offered and performed, and continues to offer and perform, unauthorized and illegal for-hire transportation services for the Miami-Dade County riding public in exchange for money.

146. LYFT's unauthorized and illegal operations have diluted the for-hire transportation market in Miami-Dade County and damaged Plaintiffs and members of the putative class through the resulting diminishment in value of the for-hire licenses.

147. Plaintiffs and the putative class seek damages, including remedies for the diminishment in valuation of the Plaintiffs' and Class Members for-hire licenses, attorney's fees, and all

compensatory damages together with interest, costs and any other just and proper relief available under FDUTPA.

## COUNT III: CLAIM FOR TORTIOUS INTERFERENCE WITH AN ADVANTAGEOUS BUSINESS RELATIONSHIP AGAINST UBER PURSUANT TO RULE 23(b)(3)

148.    Plaintiffs and the putative class re-allege and incorporate by reference the allegations contained in paragraphs one (1) through one hundred twenty-three (123) of this Complaint as if fully set forth herein and further allege as follows.

149.    This count is brought on behalf of the putative class.

150.    Plaintiffs and members of the putative class are for-hire license holders in Miami-Dade County.

151.    Defendant, UBER, is a passenger service company that has neither acquired, nor required its drivers to acquire for-hire licenses, but who still knowingly and intentionally provided, and continues to provide, unauthorized and illegal for-hire transportation services within Miami-Dade County.

152.    As for-hire license holders, Plaintiffs and the putative class had an existing advantageous business relationship with the riding public, as they were the only entities authorized by Miami-Dade County to provide for-hire transportation.

153.    Additionally, or in the alternative to paragraph 150, Plaintiffs and the putative class had an existing advantageous business relationship with Miami-Dade County based on Miami-Dade County's exclusive authorization of for-hire licensed vehicles to provide for-hire transportation services within Miami-Dade County.

154.    Because the amount of authorized for-hire licenses in Miami-Dade County is capped, Plaintiffs and members of the putative class depend on the exclusivity of authorization to value their for-hire licenses.

155.   Prior to beginning operations in Miami-Dade County, UBER, was aware of, or had constructive knowledge of, the advantageous business relationship shared by Plaintiffs and the putative class and either the riding public or Miami-Dade County by virtue of the existence of section 31 of the MDCCO.

156.   Despite knowledge of the advantageous business relationships shared by the Plaintiffs and the putative class and either the riding public and/or Miami-Dade County, UBER, began offering unauthorized and illegal for-hire transportation services in Miami-Dade County in approximately June of 2014.

157.   The operations by UBER in Miami-Dade County intentionally and unjustifiably interfered with, and continue to impair the advantageous business relationships between the Plaintiffs and the putative class and the riding public and/or Miami-Dade County by offering unauthorized for-hire transportation services to the riding public, and thereby depriving Plaintiffs and the putative class of their property rights as exclusively authorized providers of such services.

158.   UBER's unauthorized and illegal operations have diluted the for-hire transportation market and damaged the Plaintiffs and the putative class through the resulting diminishment in value of the for-hire licenses.

159.   Plaintiffs and the putative class seek damages including all remedies for the diminishment in value of their for-hire licenses, attorney's fees, and all compensatory damages together with interest, costs and other such relief as the Court deems just and proper.

## COUNT IV: CLAIM FOR TORTIOUS INTERFERENCE WITH AN ADVANTAGEOUS BUSINESS RELATIONSHIP CLAIMS AGAINST LYFT PURSUANT TO RULE 23(b)(3)

160. Plaintiffs and the putative class re-allege and incorporate by reference the allegations contained in paragraphs one (1) through one hundred twenty-three (123) of this Complaint as if fully set forth herein and further allege as follows.

161. This count is brought on behalf of the putative class.

162. Plaintiffs and members of the putative class are for-hire license holders in Miami-Dade County.

163. Defendant, LYFT, is a passenger service company that has neither acquired, nor required its drivers to acquire for-hire licenses, but who still knowingly and intentionally provided, and continues to provide, unauthorized and illegal for-hire transportation services within Miami-Dade County.

164. As for-hire license holders, Plaintiffs and members of the putative class had an existing advantageous business relationship with the riding public, as they were the only entities authorized by Miami-Dade County to provide for-hire transportation services.

165. Additionally, or in the alternative to paragraph 162, Plaintiffs and the putative class had an existing advantageous business relationship with Miami-Dade County based on Miami-Dade County's exclusive authorization of for-hire licensed vehicles to provide for-hire transportation services within Miami-Dade County.

166. Because the amount of authorized for-hire licenses in Miami-Dade County is capped, Plaintiffs and members of the putative class depend on the exclusivity of authorization to value their for-hire licenses.

167. Prior to beginning operations in Miami-Dade County, LYFT, was aware of, or had constructive knowledge of, the advantageous business relationship shared by Plaintiffs

and the putative class and either the riding public or Miami-Dade County by virtue of the existence of section 31 of the MDCCO.

168.    Despite knowledge of the advantageous business relationships shared by the Plaintiffs and the putative class and either the riding public and/or Miami-Dade County, LYFT, began offering unauthorized and illegal for-hire transportation services in Miami-Dade County in approximately June of 2014.

169.    The operations by LYFT in Miami-Dade County intentionally and unjustifiably interfered with, and continue to impair the advantageous business relationships between the Plaintiffs and the putative class and the riding public and/or Miami-Dade County by offering unauthorized for-hire transportation services to the riding public, and thereby depriving Plaintiffs and the putative class of their property rights as exclusively authorized providers of such services.

170.    LYFT's unauthorized and illegal operations have diluted the for-hire transportation market and damaged the Plaintiffs and the putative class through the resulting diminishment in value of for-hire licenses.

171.    Plaintiffs and the putative class seek damages including all remedies for the diminishment in value of their for-hire licenses, attorney's fees, and all compensatory damages together with interest, costs and other such relief as the Court deems just and proper.

## COUNT V: CLAIM FOR TORTIOUS INTERFERENCE WITH A CONTRACTUAL BUSINESS RELATIONSHIP AGAINST UBER PURSUANT TO RULE 23(b)(3)

172.    Plaintiffs and the putative class re-allege and incorporate by reference the allegations contained in paragraphs one (1) through one hundred twenty-three (123) of this Complaint as if fully set forth herein and further allege as follows.

173. This count is brought on behalf of the putative class.

174. Plaintiffs and members of the putative class are for-hire license holders in Miami-Dade County.

175. Defendant, UBER, is a passenger service company that has neither acquired, nor required its drivers to acquire for-hire licenses, but who still knowingly and intentionally provided, and continues to provide, unauthorized and illegal for-hire transportation services within Miami-Dade County.

176. In the form of the for-hire license, Plaintiffs and the putative class had an actual existing contract, which provided for the exclusive authorization of the provision of for-hire transportation services within Miami-Dade County.

177. Because the amount of authorized for-hire licenses in Miami-Dade County is capped, Plaintiffs and members of the putative class depend on the exclusivity of authorization to value their for-hire licenses.

178. Prior to beginning operations in Miami-Dade County, UBER was aware of, or had constructive knowledge of, the contractual relationship shared by Plaintiffs and the putative class and Miami-Dade County by virtue of the existence of Section 31 of the MDCCO.

179. Despite knowledge of the contractual relationship shared by Plaintiffs and the putative class and Miami-Dade County, UBER began offering for-hire transportation services in Miami-Dade County in approximately June of 2014, which was in direct contravention to the MDCCO.

180. The operations by UBER intentionally and unjustifiably interfered with, and continue to impair, the contractual relationships between Plaintiffs and the putative class and Miami-

Dade County by offering unauthorized for-hire transportation services to the riding public, and thereby depriving Plaintiffs and members of the putative class of their rights as exclusively authorized providers of such services.

181.  UBER's unauthorized and illegal operations have diluted the for-hire transportation market and damaged Plaintiffs and members of the putative class through the resulting diminishment in value of the for-hire licenses.

182.  Plaintiffs and the putative class seek damages including all remedies for the diminishment in valuation of the for-hire licenses, attorney's fees, and all compensatory damages together with interest, costs and other such relief as the Court deems just and proper.

## COUNT VI: CLAIM FOR TORTIOUS INTERFERENCE WITH A CONTRACTUAL BUSINESS RELATIONSHIP AGAINST LYFT PURSUANT TO RULE 23(b)(3)

183.  Plaintiffs and the putative class re-allege and incorporate by reference the allegations contained in paragraphs one (1) through one hundred twenty-three (123) of this Complaint as if fully set forth herein and further allege as follows.

184.  This count is brought on behalf of the putative class.

185.  Plaintiffs and members of the putative class are for-hire license holders in Miami-Dade County.

186.  Defendant, LYFT, is a passenger service company that has neither acquired, nor required its drivers to acquire for-hire licenses, but who still knowingly and intentionally provided, and continues to provide, unauthorized and illegal for-hire transportation services within Miami-Dade County.

187. In the form of for-hire licenses, Plaintiffs and members of the putative class had an actual existing contract, which provided for the exclusive authorization of the provision of for-hire transportation services within Miami-Dade County.

188. Because the amount of authorized for-hire licenses in Miami-Dade County is capped, Plaintiffs and members of the putative class depend on the exclusivity of authorization to value their for-hire licenses.

189. Prior to beginning operations in Miami-Dade County, LYFT was aware of, or had constructive knowledge of, the contractual relationship shared by the Plaintiffs and putative class and Miami-Dade County by virtue of the existence of Section 31 of the MDCCO.

190. Despite knowledge of the contractual relationship shared by Plaintiffs and the putative class and Miami-Dade County, LYFT began offering for-hire transportation services in Miami-Dade County in approximately June of 2014, which was in direct contravention to the laws of the MDCCO.

191. The operations by LYFT intentionally and unjustifiably interfered with, and continue to impair the contractual relationships between Plaintiffs and the putative class and Miami-Dade County by offering unauthorized for-hire transportation services to the riding public, and thereby depriving Plaintiffs and members of the putative class of their rights as exclusively authorized providers of such services.

192. LYFT's unauthorized and illegal operations have diluted the for-hire transportation market and damaged Plaintiffs and members of the putative class through the resulting diminishment in value of for-hire licenses.

193.   Plaintiffs and the putative class seek damages including all remedies for the diminishment in valuation of the for-hire licenses, attorney's fees, and all compensatory damages together with interest, costs and other such relief as the Court deems just and proper.

## COUNT VII: CLAIM FOR VIOLATIONS OF THE FLORIDA RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT ("FLORIDA RICO ACT"), Fla. Stat. 895.01 *et. seq.* BY UBER PURSUANT TO RULE 23(b)(3)

194.   Plaintiffs and the putative class re-allege and incorporate by reference the allegations contained in paragraphs one (1) through one hundred twenty-three (123) of this Complaint as if fully set forth herein and further allege as follows.

195.   This count is brought on behalf of the putative class.

196.   Plaintiffs and members of the putative class are for-hire license holders in Miami-Dade County. These for-hire licenses authorize the exclusive provision of for-hire transportation services within Miami-Dade County, and are defined as "intangible property," which qualifies them as chattel.

197.   FLORIDA's RICO ACT imposes civil liability on businesses or enterprises that conduct or participate in a pattern of racketeering activity in interstate commerce.

198.   Defendant, UBER, is a passenger service company that has neither acquired, nor required its drivers to acquire for-hire licenses, but who still knowingly and intentionally provided, and continues to provide, unauthorized and illegal for-hire transportation services within Miami-Dade County.

199.   Defendant, UBER, has engaged in a pattern of racketeering activity within the meaning of the FLORIDA RICO ACT by committing gross fraud or cheat at common law.

200.   In Florida, gross fraud or cheat has been defined as "knowingly and designedly, by false pretense, obtaining from any person or persons, money, goods, wares or merchandise with the intent to cheat or defraud said person or persons of same." *State v. Vikhlyantsev*, 622 So. 2d 1365, 1367 (Fla. 1st DCA 1993).

201.   As defined by Florida common law, Defendant, UBER, has engaged in a pattern of racketeering activity in Miami-Dade County, Florida, constituting gross fraud or cheat since approximately June 2014, and among and between UBER and the drivers for same, with the intent to defraud Plaintiffs and the members of the putative class, because it:

   a.   Knowingly designed to provide unauthorized and illegal for-hire transportation services to the riding public in exchange for money;

   b.   Operated under the false pretense that its for-hire services were/are authorized when it knew that it lacked for-hire licenses; and

   c.   Collected revenues based on the aforementioned false pretense, thereby constructively obtaining revenues from Plaintiffs and the putative class as a result of the fact that only Plaintiffs and the putative class were able to collect money for for-hire transportation services in Miami-Dade County.

202.   The Defendant, UBER, is engaged in interstate commerce through the use of interstate wires, including, but not limited to, the use of mobile communications networks, wireless communications networks, credit card processing transactions, bank to bank payments, and transfers of funds to conduct their respective services. Defendant, UBER's actions affect interstate commerce because they solicit sales across state lines using the internet, electronic mailings, pre-installed mobile phone applications, and the news media.

203.   UBER's unauthorized and illegal operations have diluted the for-hire transportation market and damaged the Plaintiffs and putative class through the resulting diminishment in value of the for-hire licenses.

204.   Plaintiffs and the putative class seek damages including all remedies for the diminishment in valuation of the Plaintiffs' for-hire licenses, attorney's fees, and any other just and proper relief pursuant to Florida Civil statutes §§ 772.103 et al., and all compensatory damages together with interest, costs and other such relief as the Court deems just and proper.

## COUNT VIII: CLAIM FOR VIOLATIONS OF THE FLORIDA RICO (RACKETEER INFLUENCED AND CORRUPT ORGANIZATION) ACT ("FLORIDA RICO ACT"), Fla. Stat. 895.01 *et. seq.* BY LYFT PURSUANT TO RULE 23(b)(3)

205.   Plaintiffs and the putative class re-allege and incorporate by reference the allegations contained in paragraphs one (1) through one hundred twenty-three (123) of this Complaint as if fully set forth herein and further allege as follows.

206.   This count is brought on behalf of the putative class.

207.   Plaintiffs and members of the putative class are for-hire license holders in Miami-Dade County. These for-hire licenses authorize the exclusive provision of for-hire transportation services within Miami-Dade County, and are defined as "intangible property," which qualifies them as chattel.

208.   FLORIDA's RICO ACT imposes civil liability on businesses or enterprises that conduct or participate in a pattern of racketeering activity in interstate commerce.

209.   Defendant, LYFT, is a passenger service company that has neither acquired, nor required its drivers to acquire for-hire licenses, but who still knowingly and intentionally provided,

and continues to provide, unauthorized and illegal for-hire transportation services within Miami-Dade County.

210. Defendant, LYFT, has engaged in a pattern of racketeering activity within the meaning of the FLORIDA RICO ACT by committing gross fraud or cheat at common law.

211. In Florida, gross fraud or cheat has been defined as "knowingly and designedly, by false pretense, obtaining from any person or persons, money, goods, wares or merchandise with the intent to cheat or defraud said person or persons of same." *State v. Vikhlyantsev*, 622 So. 2d 1365, 1367 (Fla. 1st DCA 1993).

212. As defined by Florida common law, Defendant, LYFT, has engaged in a pattern of racketeering activity in Miami-Dade County, Florida, constituting gross fraud or cheat since approximately June 2014, and among and between LYFT and the drivers for same, with the intent to defraud Plaintiffs and the members of the putative class, because it:

    a. Knowingly designed to provide unauthorized and illegal for-hire transportation services to the riding public in exchange for money;

    b. Operated under the false pretense that its for-hire services were/are authorized when it knew that it lacked for-hire licenses; and

    c. Collected revenues based on the aforementioned false pretense, thereby constructively obtaining revenues from Plaintiffs and the putative class as a result of the fact that only Plaintiffs and the putative class were able to collect money for for-hire transportation services in Miami-Dade County.

213. The Defendant, LYFT, is engaged in interstate commerce through the use of interstate wires, including, but not limited to, the use of mobile communications networks, wireless communications networks, credit card processing transactions, bank to bank payments,

and transfers of funds to conduct their respective services. Defendant, UBER's actions affect interstate commerce because they solicit sales across state lines using the internet, electronic mailings, pre-installed mobile phone applications, and the news media.

214.   LYFT's unauthorized and illegal operations have diluted the for-hire transportation market and damaged the Plaintiffs and putative class through the resulting diminishment in value of the for-hire licenses.

215.   Plaintiffs and the putative class seek damages including all remedies for the diminishment in valuation of the Plaintiffs' for-hire licenses, attorney's fees, and any other just and proper relief pursuant to Florida Civil statutes §§ 772.103 et al., and all compensatory damages together with interest, costs and other such relief as the Court deems just and proper.

## COUNT IX: CLAIM FOR TRESPASS TO CHATTELS BY UBER PURSUANT TO RULE 23(b)(3)

216.   Plaintiffs and the putative class re-allege and incorporate by reference the allegations contained in paragraphs one (1) through one hundred twenty-three (123) of this Complaint as if fully set forth herein and further allege as follows.

217.   This count is brought on behalf of the putative class.

218.   Plaintiffs and members of the putative class are for-hire license holders in Miami-Dade County. These for-hire licenses authorize the exclusive provision of for-hire transportation services within Miami-Dade County, and are defined as "intangible property," which qualifies them as chattel.

219.   Moreover, the exclusive authority bestowed upon the owners of for-hire licenses to provide for-hire transportation services is an exclusive chattel right derived from the for-hire license.

220.   The economic valuation of the for-hire license is based on the consideration of the exclusive provision of for-hire transportation services by the for-hire license holder in Miami-Dade County.

221.   Defendant, UBER, is a passenger service company that has neither acquired, nor required its drivers to acquire for-hire licenses, but who still knowingly and intentionally provided, and continues to provide, unauthorized and illegal for-hire transportation services within Miami-Dade County.

222.   Through its unauthorized and illegal provision of for-hire transportation services to members of the riding public, the Defendant, UBER, interfered with the possessory interest held by the Plaintiffs and the putative class in the rights bestowed by the for-hire licenses, to wit: their rights to exclusively provide for-hire transportation services within Miami-Dade County, and therefore their rights to collect income from same.

223.   All such interference with property rights derived from the for-hire licenses by the Defendant, UBER, has been against the will of the Plaintiffs and the putative class.

224.   The unauthorized and illegal provision of for-hire transportation services by the Defendant, UBER, intentionally and unjustifiably interfered and continues to impair the business relationship between the Plaintiffs and the putative class and the riding public and/or Miami-Dade County by diluting the for-hire transportation services market, thereby depriving the Plaintiffs and members of the putative class of their property rights as exclusively authorized providers of such services.

225.   UBER's unauthorized and illegal operations have diluted the for-hire transportation market and damaged the Plaintiffs and the putative class through the resulting diminishment in value of the for-hire licenses.

226. The Plaintiffs and putative class seek damages including all remedies for the diminishment in valuation of for-hire licenses, attorney's fees, and all compensatory damages together with interest, costs and other such relief as the Court deems just and proper.

## COUNT X: CLAIM FOR TRESPASS TO CHATTELS BY LYFT PURSUANT TO RULE 23(b)(3)

227. Plaintiffs and the putative class re-allege and incorporate by reference the allegations contained in paragraphs one (1) through one hundred twenty-three (123) of this Complaint as if fully set forth herein and further allege as follows.

228. This count is brought on behalf of the putative class.

229. Plaintiffs and members of the putative class are for-hire license holders in Miami-Dade County. These for-hire licenses authorize the exclusive provision of for-hire transportation services within Miami-Dade County, and are defined as "intangible property," which qualifies them as chattel.

230. Moreover, the exclusive authority bestowed upon the owners of for-hire licenses to provide for-hire transportation services is an exclusive chattel right derived from the for-hire license.

231. The economic valuation of the for-hire license is based on the consideration of the exclusive provision of for-hire transportation services by the for-hire license holder in Miami-Dade County.

232. Defendant, LYFT, is a passenger service company that has neither acquired, nor required its drivers to acquire for-hire licenses, but who still knowingly and intentionally provided, and continues to provide, unauthorized and illegal for-hire transportation services within Miami-Dade County.

51

233.   Through its unauthorized and illegal provision of for-hire transportation services to members of the riding public, the Defendant, LYFT, interfered with the possessory interest held by the Plaintiffs and the putative class in the rights bestowed by the for-hire licenses, to wit: their rights to exclusively provide for-hire transportation services within Miami-Dade County, and therefore their rights to collect income from same.

234.   All such interference with property rights derived from the for-hire licenses by the Defendant, LYFT, has been against the will of the Plaintiffs and putative class.

235.   The unauthorized and illegal provision of for-hire transportation services by the Defendant, LYFT, intentionally and unjustifiably interfered and continues to impair the business relationship between Plaintiffs and the putative class and the riding public and/or Miami-Dade County by diluting the for-hire transportation services market, thereby depriving members of the class of their property rights as exclusively authorized providers of such services.

236.   LYFT's unauthorized and illegal operations have diluted the for-hire transportation market and damaged the Plaintiffs and putative class through the resulting diminishment in value of the for-hire licenses.

237.   Plaintiffs and the putative class seek damages including all remedies for the diminishment in valuation of the for-hire licenses, attorney's fees, and all compensatory damages together with interest, costs and other such relief as the Court deems just and proper.

## COUNT XI: CLAIM FOR UNJUST ENRICHMENT BY UBER PURSUANT TO RULE 23(b)(3)

238.   Plaintiffs and the putative class re-allege and incorporate by reference the allegations contained in paragraphs one (1) through one hundred twenty-three (123) of this Complaint as if fully set forth herein and further allege as follows.

239.   This count is brought on behalf of the putative class.

240.   Plaintiffs and members of the putative class are for-hire license holders in Miami-Dade County. These for-hire licenses authorize the exclusive provision of for-hire transportation services within Miami-Dade County, and only a limited amount of others who are also so authorized.

241.   Defendant, UBER, is a passenger service company that has neither acquired, nor required its drivers to acquire for-hire licenses, but who still knowingly and intentionally provided, and continues to provide, unauthorized and illegal for-hire transportation services within Miami-Dade County.

242.   Plaintiffs and the putative class conferred upon UBER an economic benefit, in the sense that UBER has availed itself of the perception of authorization and legitimacy held by community toward authorized for-hire license holders such as the Plaintiffs and the putative class, that are subject to the scrutiny and regulations found in the MDCCO.

243.   As a result of the economic benefit conferred upon UBER by the Plaintiffs and the putative class, UBER has diluted the for-hire transportation market in Miami-Dade County through its unauthorized and illegal for-hire transportation services and profited therefrom, thereby diminishing the value of for-hire licenses in Miami-Dade County.

244.   UBER's financial benefits resulting from their knowing and intentional operation of unauthorized and illegal for-hire transportation services in Miami-Dade County which

capitalize on the perceptions of authorization and legitimacy held by the community authorized for-hire license holders such as the Plaintiffs and the putative class, and are economically traceable to the income UBER has derived from same.

245.    The economic benefits of the income derived from the UBER's unauthorized and illegal operation of for-hire transportation services are a direct result of UBER's unlawful practices.

246.    It would be inequitable and unjust for UBER to be permitted to retain any of the unlawful proceeds resulting from their unauthorized and illegal.

247.    As alleged in this Complaint, UBER has been unjustly enriched as a result of its wrongful conduct. Plaintiffs and the putative class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by the Defendant as a result of such practices.

## COUNT XII: CLAIM FOR UNJUST ENRICHMENT BY LYFT PURSUANT TO RULE 23(b)(3)

248.    Plaintiffs and the putative class re-allege and incorporate by reference the allegations contained in paragraphs one (1) through one hundred twenty-three (123) of this Complaint as if fully set forth herein and further allege as follows.

249.    This count is brought on behalf of the putative class.

250.    Plaintiffs and members of the putative class are for-hire license holders in Miami-Dade County. These for-hire licenses authorize the exclusive provision of for-hire transportation services within Miami-Dade County, and only a limited amount of others who are also so authorized.

251.   Defendant, LYFT, is a passenger service company that has neither acquired, nor required its drivers to acquire for-hire licenses, but who still knowingly and intentionally provided, and continues to provide, unauthorized and illegal for-hire transportation services within Miami-Dade County.

252.   Plaintiffs and members of the putative class conferred upon LYFT an economic benefit, in the sense that UBER has availed itself of the perception of authorization and legitimacy held by community toward authorized for-hire license holders such as Plaintiffs and the putative class, that are subject to the scrutiny and regulations found in the MDCCO.

253.   As a result of the economic benefit conferred upon LYFT by Plaintiffs and the putative class, LYFT has diluted the for-hire transportation market in Miami-Dade County through its unauthorized and illegal for-hire transportation services and profited therefrom, thereby diminishing the value of for-hire licenses in Miami-Dade County.

254.   LYFT's financial benefits resulting from their knowing and intentional operation of unauthorized and illegal for-hire transportation services in Miami-Dade County which capitalize on the perceptions of authorization and legitimacy held by the community authorized for-hire license holders such as the Plaintiffs and the putative class, and are economically traceable to the income UBER has derived from same.

255.   The economic benefit of the income derived from the LYFT's unauthorized and illegal operation of for-hire transportation services are a direct result of LYFT's unlawful practices.

256.   It would be inequitable and unjust for LYFT to be permitted to retain any of the unlawful proceeds resulting from their unauthorized and illegal.

257. As alleged in this Complaint, LYFT has been unjustly enriched as a result of its wrongful conduct. Plaintiffs and the putative class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by the Defendant as a result of such practices.

## COUNT XIII: CLAIM FOR VIOLATIONS OF THE LANHAM ACT 15 U.S.C. § 1125(a)(1)(B), BY UBER PURSUANT TO RULE 23(b)(3)

258. Plaintiffs and the putative class re-allege and incorporate by reference the allegations contained in paragraphs one (1) through one hundred twenty-three (123) of this Complaint as if fully set forth herein and further allege as follows.

259. This count is brought on behalf of the putative class.

260. Plaintiffs and members of the putative class are for-hire license holders in Miami-Dade County. These for-hire licenses authorize the exclusive provision of for-hire transportation services within Miami-Dade County, and only a limited amount of others who are also so authorized.

261. Defendant, UBER, is a passenger service company that has neither acquired, nor required its drivers to acquire for-hire licenses, but who still knowingly and intentionally provided, and continues to provide, unauthorized and illegal for-hire transportation services within Miami-Dade County.

262. The Lanham Act, codified at 15 U.S.C. § 1125(a)(1)(B) states in part:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's

goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

263. As stated more fully above, UBER has made false or misleading statements of fact about its products/services; the statements have actually deceived or had the tendency to deceive a substantial segment of their audience; the deceptions are material in that they are likely to influence the decisions of a member of the riding public to use the for-hire transportation services of UBER; and the statements entered interstate commerce. These misrepresentations include but are not limited to representations that UBER is a ridesharing company, that UBER and its drivers are partners, that UBER insures its drivers, and that UBER is in compliance with local rules and regulations.

264. Plaintiffs and the members of the putative class believe they have been or are likely to be injured as a result of UBER's unlawful and misrepresented descriptions of its services.

265. Pursuant to 15 U.S.C. 1117(a), Plaintiffs and members of the putative class seek a recovery of UBER's profits in Miami-Dade County, as well as the costs of this action, including their reasonable and necessary attorney fees. Should the court determine that the amount of the recovery of the UBER's profits is inadequate in order to compensate Plaintiffs for the UBER's actions, the Court should enter judgment for such sum the Court shall find to be just, according to the circumstances of this case.

266. Plaintiffs and the putative class seek damages including all remedies for the loss in valuation of the for-hire licenses, attorney's fees, and all compensatory damages together with interest, costs and other such relief as the Court deems just and proper.

## COUNT XIV: CLAIM FOR VIOLATIONS OF THE LANHAM ACT 15 U.S.C. § 1125(a)(1)(B), BY LYFT PURSUANT TO RULE 23(b)(3)

267.  Plaintiffs and the putative class re-allege and incorporate by reference the allegations contained in paragraphs one (1) through one hundred twenty-three (123) of this Complaint as if fully set forth herein and further allege as follows.

268.  This count is brought on behalf of the putative class.

269.  Plaintiffs and members of the putative class are for-hire license holders in Miami-Dade County. These for-hire licenses authorize the exclusive provision of for-hire transportation services within Miami-Dade County, and only a limited amount of others who are also so authorized.

270.  Defendant, LYFT, is a passenger service company that has neither acquired, nor required its drivers to acquire for-hire licenses, but who still knowingly and intentionally provided, and continues to provide, unauthorized and illegal for-hire transportation services within Miami-Dade County.

271.  The Lanham Act, codified at 15 U.S.C. § 1125(a)(1)(B) states in part:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

272.  As stated more fully above, LYFT has made false or misleading statements of fact about its products/services; the statements have actually deceived or had the tendency to deceive a substantial segment of their audience; the deceptions are material in that they

are likely to influence the decisions of a member of the riding public to use the for-hire transportation services of LYFT; and the statements entered interstate commerce. These misrepresentations include but are not limited to representations that LYFT is a ridesharing company, that LYFT insures its drivers, and that LYFT is in compliance with local rules and regulations.

273.  Plaintiffs and members of the putative class believe they have been or are likely to be injured as a result of LYFT's unlawful and misrepresented descriptions of its services.

274.  Pursuant to 15 U.S.C. 1117(a), Plaintiffs and members of the putative class seek a recovery of LYFT's profits in Miami-Dade County, as well as the costs of this action, including their reasonable and necessary attorney fees. Should the court determine that the amount of the recovery of the LYFT's profits is inadequate in order to compensate Plaintiffs for the LYFT's actions, the Court should enter judgment for such sum the Court shall find to be just, according to the circumstances of this case.

275.  Plaintiffs and the putative class seek damages including all remedies for the loss in valuation of the for-hire licenses, attorney's fees, and all compensatory damages together with interest, costs and other such relief as the Court deems just and proper.

## COUNT XV: CLAIM FOR DECLATORY JUDGMENT AGAINST UBER PURSUANT TO RULE 23(b)(2)

276.  Plaintiffs and the putative class re-allege and incorporate by reference the allegations contained in paragraphs one (1) through one hundred twenty-three (123) of this Complaint as if fully set forth herein and further allege as follows.

277.  This count is brought on behalf of the putative class.

278.  Plaintiffs and members of the putative class are for-hire license holders in Miami-Dade County. These for-hire licenses authorize the exclusive provision of for-hire

transportation services within Miami-Dade County, and only a limited amount of others who are also so authorized.

279.  Defendant, UBER, contends that it is a ridesharing service that is not within the regulations of section 31 of the MDCCO.

280.  Plaintiffs and members of the putative class are in doubt as to whether UBER is a passenger service company within the meaning of section 31 of the MDCCO.

281.  The Plaintiffs and members of the putative class are in doubt as to whether UBER is operating in violation of the rules promulgated in section 31 of the MDCCO.

282.  There is a *bona fide* dispute between the parties hereto and the Plaintiffs and putative class do raise justiciable issues as to the non-existence of their rights, powers, obligations, and legal relations and there is an actual or present need for a declatory judgment as to the issues set forth herein.

283.  Plaintiffs and the putative class are in doubt as to their rights, powers, obligations, and legal relations and there is an actual and present need for a declatory judgment as to the issues set forth herein.

284.  Plaintiffs have retained the undersigned law firm to act on its behalf in this action.

285.  Plaintiffs and the putative class seek damages that flow directly from the declaration including all remedies for the loss in valuation of the for-hire licenses, attorney's fees, and all compensatory damages together with interest, costs and other such relief as the Court deems just and proper.

## COUNT XVI: CLAIM FOR DECLATORY JUDGMENT AGAINST LYFT PURSUANT TO RULE 23(b)(2)

286.    Plaintiffs and the putative class re-allege and incorporate by reference the allegations contained in paragraphs one (1) through one hundred twenty-three (123) of this Complaint as if fully set forth herein and further allege as follows.

287.    This count is brought on behalf of the putative class.

288.    Plaintiffs and members of the putative class are for-hire license holders in Miami-Dade County. These for-hire licenses authorize the exclusive provision of for-hire transportation services within Miami-Dade County, and only a limited amount of others who are also so authorized.

289.    Defendant, LYFT, contends that it is a ridesharing service that is not within the regulations of section 31 of the MDCCO.

290.    Plaintiffs and members of the putative class are in doubt as to whether LYFT is a passenger service company within the meaning of section 31 of the MDCCO.

291.    The Plaintiffs and members of the putative class are in doubt as to whether LYFT is operating in violation of the rules promulgated in section 31 of the MDCCO.

292.    There is a *bona fide* dispute between the parties hereto and the Plaintiffs and putative class do raise justiciable issues as to the non-existence of their rights, powers, obligations, and legal relations and there is an actual or present need for a declatory judgment as to the issues set forth herein.

293.    Plaintiffs and the putative class are in doubt as to their rights, powers, obligations, and legal relations and there is an actual and present need for a declatory judgment as to the issues set forth herein.

294.    Plaintiffs have retained the undersigned law firm to act on its behalf in this action.

295.    Plaintiffs and the putative class seek damages that flow directly from the declaration including all remedies for the loss in valuation of the for-hire licenses, attorney's fees, and all compensatory damages together with interest, costs and other such relief as the Court deems just and proper.

### PRAYER

**WHEREFORE**, Plaintiffs, on behalf of themselves and all other similarly situated Class members, pray for judgment against Defendants and other relief as follows:

1. Declare this action to be a proper class action maintainable under Rule 23(b)(2) and/or 23(b)(3) of the Federal Rules of Civil Procedure and designate and appoint Plaintiffs as a class, and Plaintiffs' chosen counsel as class counsel;

2. Declare that Defendants are passenger service companies operating without a passenger service company registration and/or for-hire license within the meaning of the MDCCO.

3. Declare the actions of Defendants as alleged herein to be unlawful, unauthorized, fraudulent, unfair, or deceptive;

4. Declare that the Defendants must disgorge, for the benefit of Plaintiffs and Class members, all or part of the ill-gotten gains they received operating unauthorized and illegal for-hire transportation services;

5. Award Plaintiffs and the putative class actual and compensatory damage, or, in the alternative, statutory damages, as proven at trial;

6. Award Plaintiffs and the putative class punitive damages in such amount as proven at trial;

7. Award Plaintiffs and the putative class their reasonable attorney's fees, costs. and post-judgment interest; and

8.  Award Plaintiffs such other further and different relief as this case may require or as

determined by this Court to be just, equitable, and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs and the putative class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Respectfully submitted this ___30th___ day of January, 2015.

By: _____
     **RALPH G. PATINO, ESQ.**
     Florida Bar No. 768881


     **PATINO & ASSOCIATES, P.A.**
     *Attorneys for the Plaintiffs*
     550 Biltmore Way, Suite 740
     Coral Gables, Florida 33134
     T: (305) 443-6163
     F: (305) 443-5635
     service@patinolaw.com