UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No: 1: 15 CV 20356
Honorable Judge Jose E. Martinez/Magistrate Judge Jonathan Goodman

MIADECO CORP., a Florida Corporation,
B & S TAXI CORP., a Florida
Corporation, CHECKER CAB
OPERATORS, INC., a Florida
Corporation, and PHIL ELLIS LOWERY,
MINNIE MAE LOWERY, EDDIELENE
GAIL LOWERY BROWN, and ARNETT
LEE JR., individually and on behalf of
others similarly situated,

     Plaintiffs,

v.

UBER TECHNOLOGIES, INC., and
LYFT, INC.,

     Defendants.

_____/

## PLAINTIFFS' CORRECTED[1]RESPONSE IN OPPOSITION TO DEFENDANT LYFT'S MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT

     Plaintiffs MIADECO CORP., a Florida Corporation, B & S TAXI CORP., a Florida Corporation, CHECKER CAB OPERATORS, INC., a Florida Corporation, and PHIL ELLIS LOWERY, MINNIE MAE LOWERY, EDDIELENE GAIL LOWERY BROWN, and ARNETT LEE JR., individually and on behalf of others similarly situated ("Plaintiffs"), respectfully submit this response opposing the Corrected Motion to Dismiss Plaintiffs' Amended Class Action Complaint filed by Defendant Lyft, Inc. ("LYFT"). [DE 50]. For the reasons discussed below, LYFT'S motion lacks merit and should be denied in all respects. In the alternative, Plaintiffs request leave to amend their complaint to cure any deficiencies the Court may perceive.

---

[1] Plaintiffs submit this corrected response to substitute new Exhibit B, the official DEO ruling, for the one that was inadvertently included as Exhibit B to Plaintiffs' original response.

## I.  INTRODUCTION

LYFT'S chief argument for dismissal of the Amended Class Action Complaint ("Complaint") is that all of Plaintiffs' claims are based on their misguided attempt to enforce a local ordinance that "lacks a private right of action" and does not apply to "new transportation network platforms" like LYFT anyway. [DE 50:1-2]. Despite the Complaint's express allegations, LYFT insists that it is not really a for-hire transportation company or dispatcher but rather a technology company with "a mobile-based ridesharing platform that provides a marketplace where persons who seek transportation to certain destinations ('Riders') can be matched with persons driving to or through those destinations ('Drivers')." [DE 50:2].  Given these benign descriptions, LYFT argues that Chapter 31 of the Miami-Dade County Code of Ordinances ("MDCCO") is a throwback to quainter times and inapplicable here because "Lyft does not provide transportation services." [DE 50:2].  LYFT'S dismissal argument fails.

First of all, LYFT overlooks that unlike the local ordinances at issue in the other lawsuits brought against it and UBER in other jurisdictions, Chapter 31 expressly creates intangible property rights in for-hire medallion/license holders like Plaintiffs. Consequently, Chapter 31 impliedly authorized Plaintiffs to invoke the courts to protect their property against incursions by gatecrashers like LYFT and others who seek to dilute and diminish such property's value by evading any regulatory oversight or responsibility.

LYFT'S claim that it bears no resemblance to a traditional transportation company/for-hire dispatcher likewise does not bear scrutiny.  The California district court recently rejected that argument in *Cotter v. Lyft, Inc.*, 2015 WL 1062407 at \*9-10 (N.D. Cal. Mar. 11, 2015), an action brought by LYFT drivers claiming that they were LYFT employees and not independent "third party contractors," like LYFT claims here. In denying LYFT'S motion for summary judgment on the employee vs. independent contractor claim, the district court reasoned as follows:

> … Lyft **tepidly asserts there is no need to decide how to classify the drivers, because they don't perform services for Lyft in the first place**. Under this theory, Lyft drivers perform services only for their riders, while Lyft is an uninterested bystander of sorts, merely furnishing a platform that allows drivers and riders to connect, analogous perhaps to a company like eBay. **But that is obviously wrong. Lyft concerns itself with far more than simply connecting random users of its platform. It markets itself to customers as an on-demand ride service, and it actively seeks out those customers** ... It gives drivers detailed instructions about how to conduct themselves. Notably, Lyft's own drivers' guide and FAQs state that

drivers are "driving for Lyft" … Therefore, **the argument that Lyft is merely a platform, and that drivers perform no service for Lyft, is not a serious one** ….

*Id.*[2]

The district court in *Cotter* thereafter concluded that the employment status issue could not be resolved on summary judgment since "[i]t would be difficult to rule as a matter of law that the plaintiffs were independent contractors when the most important factor for discerning the relationship under California law, namely, the right of control, tends to cut the other way." *Id.* at *9. In this connection, the district court was careful to note that "the work performed by [LYFT] drivers is "wholly integrated" into Lyft's business—after all, Lyft could not exist without its drivers—and **the riders are [LYFT's] customers, not the drivers' customers**." *Id.* at *10 (citations, quotations, and brackets omitted). Plaintiffs submit that *Cotter* is right on the money and its holding defeats LYFT's dismissal argument. Given the analysis there, there can be no question that LYFT acts as if it were a passenger service company and/or for-hire dispatcher within the meaning of the MDCCO, just as the Complaint alleges. [DE 40: ¶58].

Likewise, there can be no question that LYFT's operations in Miami-Dade County are unauthorized and illegal. The Miami-Dade County Commission on Ethics and Public Trust, on behalf of the County, went on record on the subject, stating that the "County has determined that **drivers for firms like Uber [and LYFT] are operating illegally** and consequently, it has issued over **700 violations** to drivers engaging in for-hire car service." [DE 40: ¶¶ 63-64; DE 49-2 at 6]. Miami-Dade County Mayor Carlos Gimenez has echoed this illegality determination as well. In a letter to LYFT's former counsel, written in his official capacity as the County's Head of Government (*see* Miami-Dade County Home Rule Charter Article 2 § 2.02), Mayor Gimenez declared: "currently **Chapter 31** of the Miami-Dade County Code (Code) **does not allow [LYFT's] operation of unlicensed vehicle[s] providing for-hire services through electronic dispatch.**" (Ex. A).[3] The letter continues:

> Section 31-82(a) of the Code states that **it shall be unlawful** for any person to use, drive or operate, or **to advertise in any medium accessible to the public that it offers for-hire services, or to cause or permit any other person to use, drive[] or**

---

[2] All emphasis has been supplied by counsel.

[3] Plaintiffs request that the Court take judicial notice of Mayor Gimenez's letter, which self-evidently is a public record. As LYFT states in its corrected motion to dismiss, a district court may take judicial notice of such records without converting a dismissal motion into a summary judgment motion. [DE 50:3 n. 5].

**operate any for-hire motor vehicle upon the streets of Miami-Dade County without first obtaining a current and valid Miami-Dade County for-hire License … Please remind your client of the rules and regulations governing for-hire operations.**

(Ex. A p. 1). Consequently, and in contrast to other actions brought against LYFT and UBER nationwide, Miami-Dade County has clearly and unambiguously indicated that LYFT's operations here violate the provisions of the MDCCO.

LYFT's additional arguments for dismissal of the Complaint do not have any merit either. LYFT's "no causation" argument [DE 50:14-15] fails since the Complaint abounds with well-pleaded factual allegations, which must be accepted as true at the dismissal stage, that LYFT's wrongdoing has resulted in the devaluation of Plaintiffs' for-hire medallions. Federal decisions in cases against LYFT and UBER prove Plaintiffs' point on this issue. And as for LYFT's related "no viable injury" argument [DE 50:14-15], LYFT disregards that Plaintiffs do not hold ordinary taxicab licenses: Plaintiffs bought and paid for Miami-Dade County for-hire medallions/licenses which -- under the express terms of Chapter 31, and as Chapter 31 has been interpreted by two federal courts in this district -- constitute intangible property entitled to judicial protection.

LYFT's claim-specific assaults on the Complaint are similarly without merit as LYFT does not apply the correct standard of review on dismissal and overlooks case law against its position. Thus, LYFT's Motion to Dismiss should be denied in its entirety.

## II. ARGUMENT

### A.    STANDARD ON DISMISSAL

LYFT seeks dismissal of Plaintiff's Complaint for failure to state a claim pursuant to Rule 12(b)(6). This Court has set forth the standard to be applied here as follows:

**When deciding a motion to dismiss, the court is limited to the four corners of the complaint and must accept all well-pleaded allegations as true, drawing all inferences in favor of the non-moving party** . . . "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the … claim is and the grounds upon which it rests.' " *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S. Ct. 1955, 1964, 167 L.Ed.2d 929 (2007) . . . If the court determines that "there are well-pleaded factual allegations, [the] court should … determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S. Ct. 1937, 1950, 173 L.Ed.2d 868 (2009). **A motion to dismiss should only be granted "when the movant demonstrates beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief**."

*Trinidad & Tobago Unit Trust Corp. v. CB Richard Ellis, Inc.*, 280 F.R.D. 676, 677-78 (S.D. Fla. 2012) (certain citations and quotations omitted).

In addition, Rule 12(b)(6)'s dismissal standard "does **not** impose a probability requirement at the pleading stage." *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309 (11th Cir. 2008) (citations and quotation omitted). Indeed, the standard "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the required element." *Id*. at 1309-10 (same). "**It is sufficient if the complaint succeeds in identifying facts that are suggestive enough to render [the element] plausible**." *Id*. at 1310 (same).

## B.   LYFT'S "NO PRIVATE RIGHT OF ACTION" ARGUMENT IS FLAWED SINCE CHAPTER 31 OF THE MDCCO CREATES A PROPERTY RIGHT OF ACTION.

### 1.   Overview.

LYFT argues that this action fails because Chapter 31 of the MDCCO does "not create a private right of action." [DE 50:5].[4]  In making this argument, LYFT erroneously discounts that Chapter 31 creates property and includes provisions for the sale of that property to private individuals. Miami-Dade County, FL, Code § 31-81(aa) ("Medallion system means the system which deems a taxicab for-hire license to be intangible property");[5] *see also S. Florida Taxicab Ass'n v. Miami-Dade County*, 2004 WL 958073 (S.D. Fla. Mar. 18, 2004) (property interest created by Chapter 31 is protectable); *Restrepo v. Miami-Dade County et al*., 2002 WL 548821 (S.D. Fla. 2002) ("[t]he term 'medallion system' [in Chapter 31] signifies that a for-hire license constitutes intangible personal property rather than a mere license").

By creating intangible property and selling it to private individuals, Miami-Dade County addressed the for-hire transportation industry in a manner differing both structurally and in-kind from those local ordinances addressed by other courts determining whether a private right of

---

[4] It is important to note that the decision in *Borja v. Uber Technologies, Inc.*, No. 15-20040-Civ-Scola (S.D. Fla. May 28, 2015), has no application in the instant case. Judge Scola addressed only whether Chapter 31 of the MDCCO created a private cause of action in favor of members of the public who are **not** holders of for-hire medallions/licenses. *Id*. at 5-6.

[5] Plaintiffs contend (and have alleged) that the County Commission's explicit denomination of a taxicab medallion as property is the last word on whether medallions constitute property in Miami-Dade County. To the extent the Court were to find otherwise, however, and rule that additional evidence is necessary, that evidence cannot be introduced on a motion to dismiss and Plaintiffs would respectfully suggest that such a determination should be made at the summary judgment stage with the benefit of testimony from County and industry officials.

action exists against entities like LYFT – i.e., entities which bear all of the hallmarks of transportation dispatchers, but meet none of the regulatory requirements.  *See* MINNEAPOLIS, MINN. CODE of ORDINANCES § 341.305 (2013); NEW ORLEANS, La. CODE of ORDINANCES § 162-59 (2012); Phila. Parking Authority Regulations for Taxicab and Limousine Serv. in the City of Phila. 11(a)(vi) (July 29, 2008); Boston Police Department Hackney Carriage Rules and Regulations (August 29, 2008) (failing to define a medallion as a property right).

LYFT suggests that because Chapter 31 does not contain magic words like "private right of action," no such action may exist.  [DE 50:6-8].  Not so: the question is whether to "judicially imply a cause of action."  *QBE Ins. Corp. v. Chalfonte Condo. Apartment Ass'n, Inc.*, 94 So. 3d 541, 550 (Fla. 2012).  While LYFT is correct that legislative intent controls whether to judicially imply a private right of action from a statute/ordinance that contains no express language to that effect, *id.* at 550-51, LYFT's analysis of the intent behind Chapter 31 is flawed because LYFT gives short shrift to the fact that Chapter 31 creates property.  Instead, LYFT analyzes the ordinance as if it is only a vehicle for "licensing procedures and regulatory duties for the vehicle for-hire industry."  [DE 50:7].  Plaintiffs submit that the creation of a property right is the evidence of legislative intent that should guide this Court's analysis.

**2.      Property Rights Are Sacrosanct Under Florida Law.**

The right to "acquire, possess, and **protect**" property is enshrined in the Florida Constitution under the heading "basic rights."  Art. I, §2, Fla. Const.  Indeed, "Property rights are among the basic substantive rights expressly protected by the Florida Constitution."  *Dep't of Law Enforcement v. Real Prop.*, 588 So. 2d 957, 964 (Fla. 1991).  Analyzing the scope of the constitutional right, the Florida Supreme Court looked toward the dictionary definition of terms "acquire," "possess," and "protect," and found that protect means "to guard, preserve and keep safe from harm, encroachment, injury, alteration, damage, or loss."  *Shriners Hosps. For Crippled Children v. Zrillic*, 563 So. 2d 64, 67 (Fla. 1990).

It is thus well established that with a property right comes the right to protect that property from those who would encroach upon the full exercise of the property right.  "American democracy is a distinct departure from other democracies in that we place emphasis on the individual and protect him in his personal property rights against the State **and all other assailants**."  *White v. Pinellas County*, 185 So. 2d 468, 471 (Fla. 1966).  And, in Florida, the

general equity jurisdiction of the circuit courts under the Constitution includes the specific enforcement of property rights. *Meloche v. Meloche*, 133 So. 339, 340 (Fla. 1931). This protection of property rights against all accosters includes protection from non-governmental entities. *E.g., Duvall v. Fair L. Acres, Inc.* 50 So. 3d 688, 671 (Fla. 2d DCA 2010) (holding that homeowner's association could not require members to give up right to dispose of property).

**3.      By Creating A Property Right, Chapter 31 Implies A Private Right Of Action.**

Despite LYFT's suggestion that the MDDCO creates an "exclusive" enforcement scheme, that word does not appear in MDCCO § 31-90, which merely provides a mechanism for enforcement "by authorized personnel of the [Consumer Services Department ("CSD")], the police forces of the various municipalities in Miami-Dade County and by the Miami-Dade Police Department." And that section, apparently recognizing that citations/police enforcement may not be enough to enforce Miami-Dade's for-hire transportation system, also provides the CSD with the right to "secure enforcement" through the courts. *Id*. at § 31-90(e). And the section of the code regarding Passenger Service Companies provides no explicit enforcement mechanism, stating only that "[v]iolations shall be punishable as provided in this chapter." *Id*. at § 31-100(l).

Although the MDCCO specifies an enforcement mechanism, it does not create an exclusive means of enforcement. Nor could it. With the creation of a property right comes certain rights and benefits enshrined in the Constitution. *Zrillic*, 563 So. 2d at 67; *White*, 185 So. 2d at 471; *Meloche*, 133 So. at 340. In creating taxicab medallions as intangible property, the drafters of Chapter 31 are presumed to have drafted it in accordance with constitutional principles. *See State Dept. of Hwy. Safety & Motor Vehicles v. Killen*, 667 So. 2d 433, 436 (Fla. 4th DCA 1996) ("The Legislature must be presumed to be aware of the 1982 amendment to the Florida Constitution"); *see also State ex rel. Gillespie v. Bay County*, 151 So. 10 (Fla. 1933) (Justice Ellis, concurring) ("Such an entry is a mere declaration that the Legislature has observed the requirements of the Constitution, which under the Constitution it is presumed to observe").

With constitutional property rights protection in mind, the drafters of Chapter 31 must have intended that owners of the created property would have the right to protect it through the judicial system. Indeed, the United States Supreme Court considered a similar issue, and implied a private right of action in *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 12-13 (1979). There, the Court evaluated whether a private right of action could be implied from § 215 of the Investment Advisors Act, which states "that contracts whose formation or performance

would violate the act shall be void … as regards the rights of the violator and knowing successors in interest."  *Id*. at 16-17.  Even though other provisions of the Act contained an express cause of action, while section 215 did not, the Court held that "[b]y declaring certain contracts void, § 215 by its terms necessarily contemplates that the issue of voidness under its criteria may be litigated somewhere."  *Id*. at 18.  "[W]hen Congress declared in § 215 that certain contracts are void, **it intended that the customary legal incidents of voidness would follow**, including the availability of a suit … for an injunction … and for restitution."  *Id*. at 19.

Just as the voidness of a contract is accompanied by "customary legal incidents," so too is the creation and sale of intangible property.  *Zrillic*, 563 So. 2d at 67; *White*, 185 So. 2d at 471; *Meloche*, 133 So. at 340.  When the Miami-Dade County Commission established Chapter 31, and "a medallion system" that is "intangible property," it must have understood that with property comes the right to protect that property in a court.   Thus, while the county may have intended to exclude the public at large from a private right of enforcement, it explicitly granted a private enforcement vehicle within the confines of the holder of the property itself.  It is of no moment, Plaintiffs submit, that no express right was granted to the for-hire medallion/license holders; that right is a "customary legal incident" to the creation of property itself.

In *Jarrell v. Orlando Transit Co.*, 167 So. 664, 666 (Fla 1936), the Florida Supreme Court addressed the question of whether the holder of an exclusive franchise from a city to provide bus transportation could protect that franchise from unregulated competition in the courts.   The Supreme Court answered in the affirmative, holding that "[t]he reason for a franchise or permit in such cases, whether it be exclusive or limited, is to secure for the public an efficient, safe, and dependable service."  *Id*. at 667.

By creating intangible property ala for-hire medallions/licenses, Miami-Dade County created medallions/licenses that are functionally no different from an exclusive franchise that "will be protected as other rights are protected" "by injunction or other appropriate relief."  *Jarrell*, 167 So. at 667.   And so it is that for-hire medallion/license holders may seek relief in the courts to protect their property rights, even in the event that LYFT's analysis would apply to prevent the public from enforcing Chapter 31.  And therein lies the rub -- LYFT would have this Court lump the public as a whole together with the for-hire medallion/license holders and then rule that there is no private right of action.  But that analysis is flawed as it disregards the level of protection the Florida and Federal constitutions grant to private property rights.

- 8 -

For all of these reasons, LYFT's arguments against the Plaintiffs' private right of action do not bear scrutiny. Moreover, even if the Court determines that Plaintiffs have no right to protect their property by alleging that LYFT is in violation of Chapter 31, Plaintiffs' Lanham Act, Trespass to Chattels, and common law Unfair Competition claims are not burdened by such a ruling and stand on their own. *See Manzo v. Uber Techns., Inc*., 2014 WL 3495401 at *5 (N.D. Ill. July 14, 2014); *Boston Cab Dispatch, Inc. v. Uber Techs., Inc.,* 2014 WL 1338144, at *25 (D. Mass. Feb. 28, 2014), *report & recommendation adopted in part & rejected in part,* 2014 WL 1338148 (D. Mass. Mar. 27, 2014).

## C.   LYFT'S "NO INJURY" AND "NO CAUSATION" ARGUMENTS ARE FLAWED SINCE PLAINTIFFS HAVE ALLEGED SUFFICIENT NON-CONCLUSORY INJURY AND CAUSATION FACTS.

Plaintiffs allege in their Complaint that in the years prior to LYFT's arrival in Miami-Dade County, there was an existing for-hire transportation market governed and defined by MDCCO Chapter 31. [DE 40: ¶¶ 34-35]. According to the MDCCO, as explained previously, for-hire medallions/licenses are intangible property. [DE 40: ¶ 36]. As a result of the limitation on the creation of new for-hire medallion/licenses and regulatory compliance in the industry, an equilibrium based on demand formed in the for-hire medallion market, allowing for-hire medallions to be valued and sold for consideration. [DE 40: ¶¶ 42-44, 143]. Then, in June of 2014, LYFT began its for-hire transportation service operations in Miami-Dade County and, as a result of these operations, misrepresentations, and other wrongdoing, the for-hire market was diluted and fares that would have rightfully been paid to Plaintiffs were and are instead paid to LYFT. [DE 40: ¶ 69]. It follows that because the valuation of for-hire medallions is tied to their profitability, LYFT's operations both directly and proximately devalued the Plaintiffs' for-hire medallions. [40: ¶¶ 42, 69]. Indeed, the Complaint alleges -- repeatedly -- that LYFT's wrongdoing has "induced customers, members of the riding public, to offer their business to LYFT instead of for-hire license holders and operators of authorized for-hire transportation services, thereby diluting the for-hire transportation services market in Miami-Dade County and diminishing the value of for-hire licenses held by Plaintiffs and the putative class." [DE 40: ¶¶ 136-37; *see also* DE 40: ¶¶ 6-12, 42, 69, 95, 106, 160-61, 182-83, 200-201].

Despite these concrete and non-conclusory factual allegations, LYFT insists that Plaintiffs' claims fail because the Complaint supposedly does not explain "why any decrease in the value of [Plaintiffs' medallions/licenses] would be attributable to [LYFT's] alleged

misrepresentations rather than to **other potential market factors**, such as a depressed tourist industry, increased new or used car sales, or population changes in Miami-Dade County, to name just a few." [DE 50:15]. LYFT also insists that "Plaintiffs have not pleaded a single fact indicating a direct relationship between any of [LYFT's] alleged statements and Plaintiffs' injury much less facts plausibly suggesting that their injury was due to those statements and not **other factors** that could have affected their business, such as the economy or the non-actionable representations of [LYFT] and others." [DE 50:15-16].  The problem with LYFT's "no injury/no causation" theory is that the Complaint does not allege any of LYFT's proffered non-actionable injury and causation explanations. Moreover, evaluation of LYFT's argument requires resolution of competing testimony that is not and cannot be before the Court at this stage of the proceedings and thus consideration of same is inappropriate.  In addition, as explained in Plaintiffs' response in opposition to UBER's dismissal motion [DE 62:11-13], the courts that have considered similar arguments from LYFT and UBER have rejected them in well-reasoned opinions that are in complete accord with the dismissal pleading standard. *See Boston Cab Dispatch, Inc. v. Uber Technologies, Inc.*, 2015 WL 314131 at *4 (D. Mass. Jan. 26, 2015); *Greater Houston Transp. Co. v. Uber Technologies, Inc.,* 2015 WL 1034254 at *8-9 (S.D. Tex. Mar. 10, 2015).[6]

**D.**     **The Complaint States A Plausible FDUTPA Claim.**

Count II asserts a claim against LYFT under FDUTPA, Fla. Stat. § 501.201 *et seq.* [DE 40: ¶¶ 124-137]. LYFT argues that this claim fails because the Act protects only "consumers,"

---

[6] LYFT may follow UBER's lead [DE 49:17-18] and attempt to argue in its Reply that Plaintiffs' damages claim is defeated because courts in Minnesota and Louisiana have found that the plaintiffs there "merely possess[ed] a license to participate in the highly regulated taxicab market [that] is subject to regulatory change." Any such argument would be without merit. These cases are off-point since the licenses at issue in them were ordinary licenses/privileges; here, Plaintiffs' for-hire medallions/licenses have been explicitly defined by Miami-Dade County as **intangible property**, a distinction with a legally substantial difference that carries with it the right of protection. *See and compare* MDCCO § 31-81(aa) ("Medallion system means the system which deems a taxicab for-hire license to be intangible property"); *Restrepo*, 2002 WL 548821; *Florida Taxicab Ass'n,* 2004 WL 958073, *with Minneapolis Taxi Owners Coal., Inc. v. City of Minneapolis*, 572 F. 3d 502 (8th Cir. 2009); MINNEAPOLIS, MINN. CODE of ORDINANCES § 341.305 (2013) (all taxicab licenses "shall remain the property of the City of Minneapolis."), and *Dennis Melancon, Inc. v. City of New Orleans,* 703 F. 3d 262 (5th Cir. 2012); NEW ORLEANS, La. CODE of ORDINANCES § 162-59 (2012) (driver's permits and CPNCs are "privileges and not rights).

and the Complaint does not allege that Plaintiffs are consumers who engaged in the purchase of goods or services. [DE 50:16]. While there is some legal support for LYFT's interpretation of the Act, *see Leon v. Tapas & Tinos, Inc*., 2014 WL 5032435 (S.D. Fla. Oct. 8, 2014), the better reasoned authorities from this district have concluded that a 2001 amendment conferred standing on business competitors as well as typical "consumer" purchasers of goods and services.

FDUTPA outlaws "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" § 501.204(1). The Act's purpose is "[t]o **protect** the consuming public and **legitimate business enterprises** [like Plaintiffs] from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2). The Florida Supreme Court has held that a practice is unfair if it "offends established public policy" or is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.,* 842 So.2d 773, 777 (Fla. 2003) (certain quotations omitted). The Act explicitly instructs that the courts are to **construe its provisions liberally**. § 501.202.

In *Aceto Corp. v. TherapeuticsMD, Inc.*, 953 F. Supp. 2d 1269 (S.D. Fla. 2013), the Court explained the evolution of FDUTPA as follows:

> Before 2001, the FDUTPA allowed "a consumer who has suffered a loss as a result of a violation" of the FDUTPA to bring a cause of action. Fla. Stat. § 501.211(2) (2000). The Florida Legislature amended § 501.211(2) to replace "consumer" with "person" in 2001 … Since that amendment, courts have disagreed as to whether nonconsumers may bring a private action under the FDUTPA … On its face, the FDUTPA statute seeks "[t]o protect the consuming public *and legitimate business enterprises* from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2) (emphasis added). It is unclear if the word "consuming" applies to only "public" or also to "legitimate business enterprises." The more natural reading is that this clause lists two independent groups that the Act seeks to protect: first, 'the consuming public,' and second, 'legitimate business enterprises. …

*Id*. at 1286-1287 (certain citations and quotations omitted; italics by the court).

Since the plaintiff there alleged that it was a legitimate business enterprise and that the defendants had engaged in wrongful activities in trade or commerce, the Court refused to dismiss the FDUTPA claim simply because the plaintiff was not a "consumer." *Id*. at 1287; *see also Kelly v. Palmer, Reifler, & Associates, P.A.,* 681 F. Supp. 2d 1356, 1372-74 (S.D. Fla. 2010)

(italics by the Court); *Niles Audio Corp. v. OEM Sys. Co.*, 174 F. Supp. 2d 1315, 1319-20 (S.D. Fla. 2001) (same). This Court should come to the same conclusion here.

Similarly without merit is LYFT's argument that its violations of Chapter 31 do not invoke FDUTPA because the ordinance does not "regulate deceptive acts or unfair trade practices." [DE 50:16]. "[V]iolations of laws or statutes that give rise to a FDUTPA claim must be of the kind that proscribe unfair trade practices or unfair methods of competition ..." *In re Edgewater By The Bay, LLLP*, 419 B.R. 511, 516 (Bankr. S.D. Fla. 2009). Chapter 31 handily meets that criteria.

Although Chapter 31 was enacted for the benefit of the riding public, that is not the ordinance's sole purpose as the regulation of the conditions under which for-hire services can be performed also protects for-hire medallion/license holders like the Plaintiffs. [DE 40: ¶ 37]. By outlawing the provision of unregulated and unlicensed for-hire transportation, Chapter 31 protects medallion/license holders from having to play an unwinnable game against interloping competitors engaging in unfair competition (like LYFT and UBER), who entered and remain in the for-hire market in complete disregard of the hefty fees and other burdens associated with regulatory compliance. [DE 40: ¶¶ 130-36].  *See Restrepo v. Miami-Dade Cnty.*, 2002 WL 548821 (S.D. Fla. Feb. 26, 2002), where the Court aptly observed while interpreting Chapter 31:

> [T]he County concluded that a numerical cap on the number of for-hire licenses was necessary because an "open entry" system would flood the market, leading to **predatory practices** [and] could lead to unsafe practices, as the rate of return for chauffeurs could be so low that for-hire license holders might cut corners by buying older and lesser quality vehicles, postponing necessary maintenance and repair of vehicles, paying chauffeurs less, or driving in a dangerous manner to beat **competing cabs** to a person hailing a cab.

*Id. at* *6.

Chapter 31 thus is an ordinance upon which a FDUTPA claim is properly based since it "proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices," § 501.203(3)(c). [DE 40: 131-132].  Accordingly, dismissal should be denied.

**E.     The Complaint States A Plausible Trespass To Chattels Claim.**

LYFT contends that the Trespass to Chattels claim must be dismissed because Plaintiffs have not identified a viable "chattel." [DE: 50: 17-18]. LYFT is mistaken. "Trespass to personal property is the **intentional** use of, or **interference with**, **a chattel** which is in the possession of

another, without justification." *Coddington v. Staab,* 716 So. 2d 850, 851 (Fla. 4th DCA 1998). The Complaint alleges that by virtue of the MDCCO, the County created property in the form of the for-hire medallions/licenses that Plaintiffs own. [DE 40: ¶ 152]. The Complaint further alleges that the MDCCO confers on Plaintiffs the exclusive authority to provide for-hire transportation services and this is an exclusive chattel right derived from the for-hire medallion/license. [DE 40: ¶¶ 153-154]. LYFT has, however, through its unauthorized and illegal provision of for-hire transportation, intentionally "**interfered with the possessory interest** held by Plaintiffs … in the property rights created by Miami-Dade County and bestowed by the for-hire licenses, to wit: their rights to exclusively provide for hire transportation services within Miami-Dade County, and therefore their rights to collect income from same." [DE 40: ¶ 157-159].

While it is true that the court in *Burshan v. Union Fire Ins. Co.*, 805 So. 2d 835, 846 (Fla. 4th DCA 2001) disallowed a trespass to chattel claim arising from garnishment of a bank account, it did so on the authority of a 1920 definition of "chattel." Plaintiffs are confident that a Florida appellate court would conclude otherwise here were a more current definition of "chattel" used, especially in the context of LYFT's intentional and unjustified interference with the property interest that the MDDCO created in favor of medallion holders. *See Black's Law Dictionary* 251 (8th ed.2004), which defines the term "chattel personal" as a "tangible good or **an intangible right (such as a patent)**; *see also In re Am. Online, Inc.*, 168 F. Supp. 2d 1359, 1380 (S.D. Fla. 2001); *eBay, Inc. v. Bidder's Edge, Inc.,* 100 F. Supp. 2d 1058, 1066-67 (N.D. Cal. 2000).

**F.     The Complaint States A Plausible Lanham Act False Advertising Claim.**

To succeed on a Lanham Act false advertising claim, the plaintiff must allege and prove:

(1) the advertisements of the opposing party were false or misleading; (2) the advertisements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) the movant has been-or is likely to be-injured as a result of the false advertising.

*Hickson Corp. v. N. Crossarm Co., Inc.,* 357 F.3d 1256, 1260 (11th Cir.2004).

A representation by a defendant can be either literally false or misleading. *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1318-19 (11th Cir. 2010). When determining whether an advertisement is actionable, courts "must analyze the message conveyed in full context," and "must view the face of the statement in its entirety...." *Id.* at 1308. "Statements that have an

- 13 -

unambiguous meaning, either facially or considered in context, may be classified as literally false." *Id*. at 1309. Where a court deems an advertisement to be literally false, the plaintiff need not present evidence of consumer deception. *Id*. at 1319. If, on the other hand, the advertisement is true but misleading, then the plaintiff is required to present evidence of deception. *Id*.

1.      **LYFT's Misrepresentation Regarding Compliance With The Local Law.**

The Complaint alleges that LYFT misrepresents that its drivers have "all appropriate licenses, approvals, and authority to provide transportation to third parties in all jurisdictions in which such [d]river uses the [s]ervices." [DE 40: ¶ 74]. LYFT argues that these statements do not support liability since there has been no finding from a "court or agency of competent jurisdiction" that LYFT has failed to comply with the MDCCO. [DE 50:11-12]. In framing the argument this way, LYFT avoids the real Lanham Act issue here – i.e., whether or not LYFT's affirmative representations of legal compliance are literally false or misleading. The answer to that question is a resounding "YES", and LYFT does not suggest otherwise.

LYFT's advertising regarding its legal compliance is literally false because, when viewed in "full context," it is reasonable to conclude that LYFT is asking the public to infer that its drivers are in compliance with the requirements found in Chapter 31 and to use LYFT's for-hire services as a result. (DE 40: ¶¶ 74, 180-81). In truth, neither LYFT nor its drivers are in compliance with the rules regulating for-hire transportation in Miami-Dade County. [DE 40 ¶¶ 55-67, 178]. Even if, as LYFT argues, such terms are contained in representations drivers make, they are still included in the overall Terms of Service distributed by LYFT for public consumption and view. By distributing such terms, LYFT is making a representation on behalf of its drivers as to the safety of its for-hire services. Alternatively, even if LYFT's representations were merely misleading, Plaintiffs satisfy the demands placed upon them at the dismissal stage, as they have sufficiently alleged that LYFT's representations are misleading and that they have materially affected the decisions of the riding public. [DE 40: ¶¶ 76, 80-83,180-81].

To the extent that LYFT has properly presented the issue here (which is denied), dismissal still is unwarranted. Statements regarding a party's alleged legal compliance are not mere non-actionable "opinions" where "a court or **agency of competent jurisdiction** has clearly and unambiguously ruled on the matter." *Ameritox, Ltd. v. Millennium Labs., Inc.*, 889 F. Supp. 2d 1304, 1317 (M.D. Fla. 2012) (quotation omitted). That is precisely what has happened in the instant case. As explained above in the Introduction section, the Miami-Dade County

Commission on Ethics and Public Trust, in an official memorandum, confirmed the County's determination that "drivers for firms like Uber [i.e., LYFT] are **operating illegally,"** and also confirmed that the County "has issued **over 700 violations** to drivers engaging in for-hire car service" for violating the MDDCO. [DE 49-2 at 6; DE 40: ¶¶ 63-64]. And if that were not enough to demonstrate the illegality of LYFT's services, Mayor Gimenez, the County's Head of Government, explicitly advised LYFT in a letter sent in his official capacity that LYFT's operations in the County violate the MDCCO because "**Chapter 31** … **does not allow [LYFT's] operation of unlicensed vehicle[s] providing for-hire services through electronic dispatch**." [Ex. A]. In light of the foregoing, the Complaint has sufficiently alleged, for dismissal purposes, that "agenc[ies] "of competent jurisdiction" have "clearly and unambiguously ruled" that LYFT is subject to the provisions of the MDCCO and that it is noncompliant with them. *Id*.[7]

LYFT'S reliance on *Dial A Car, Inc. v. Transp. Inc.*, 82 F. 3d 484, 485 (D.C. Cir. 1996) and *Greater Houston Transp. Co. v. Uber Techs., Inc.*, 2015 WL 1034254 (S.D. Tex. Mar. 10, 2015) is misplaced. In *Dial A Car*, the court held that a Lanham Act claim failed because there was no clear and unambiguous statement from a court or agency of competent jurisdiction regarding the offending taxicabs' status vis-à-vis local regulations. 82 F. 3d at 488-89. Here, in contrast, there are such statements from two agencies of competent jurisdiction, coupled with hundreds of police citations, indicating that LYFT's (and UBER's) for-hire transportation services are illegal and unauthorized.[8] [DE 49-2 at 6; DE 40: ¶¶ 63-64].

---

[7] In this connection, Plaintiffs request that the Court take judicial notice of Exhibit B (see footnote 2 above), a public record which shows that the Florida Department of Economic Opportunity recently found that an UBER driver was an UBER employee and not an independent contractor. That finding, Plaintiffs submit, is directly relevant to the legal status of LYFT drivers too, since both defendants provide the same service, and, just like the California federal court decision in *Cotter*, discussed in the Introduction section, further cements LYFT's [and UBER's] status as a passenger service company/dispatchers under the MDCCO.

[8] In addition to the agency statements, LYFT's analysis is faulty because the laws regarding for-hire transportation in Miami-Dade County were and are unambiguous. A passenger service company's functions consist of "providing for-hire vehicle color schemes and markings; providing two-way radio or cellular telephone dispatch services; maintenance and advertising of a telephone number for receiving all calls related to for-hire taxi services; handling passenger complaints and passenger lost and found; [and maintaining] a properly listed telephone for receiving all calls relating to for-hire vehicle service. [DE 40: ¶ 31]. That LYFT is providing for-hire transportation is all but certain, as its drivers are dispatched by LYFT to provide point-to-point transportation services in exchange for monetary compensation, under the logo and

*Greater Houston Transp. Co.* is easily distinguished as well.  In that case, the court ruled that citations and cease-and-desist letters to UBER and LYFT were insufficient to defeat dismissal of a legal compliance misrepresentation claim brought by licensed taxicab operators. However, the court's ruling hinged on the fact that, during the course of the litigation, the relevant jurisdictions changed their for-hire regulations. *Id*. at *5 ("The citations and the cease-and-desist letters … predate the recent amendments to the [regulations] and the new ordinances are subject to multiple interpretations …."). Conversely, there has been no intervening change in the law here to discredit or otherwise neutralize the hundreds of citations and clear and unambiguous statements from agencies of competent jurisdiction that Chapter 31 of the MDDCO applies to LYFT (and UBER) and that both defendants are in violation of the same.

**2.      LYFT's Insurance Misrepresentations.**

LYFT also claims that it has not misrepresented the nature and character of its insurance coverage. [DE 50:13). This argument also lacks merit. Plaintiffs' claims regarding LYFT's liability insurance coverage revolve around the applicability of LYFT's "$1,000,000" policy limits. [DE 40: ¶¶ 80-81].  Because LYFT fails to disclose the full contents of its policy, Plaintiffs are left to examine LYFT's terms of service and wonder when LYFT's coverage in fact applies, to whom it applies, and under what circumstances it applies. [DE 40: ¶¶ 80-84, 87-95). Absent any indication that Plaintiffs' allegations are incorrect, their claims that LYFT's $1,000,000 policy is inapplicable must be taken as true and in the light most favorable to Plaintiffs. Plaintiffs thus meet the required pleading threshold to withstand a motion to dismiss.

 LYFT wrongly argues that its representations regarding its insurance were non-actionable puffery. First, "[s]pecific, quantifiable 'statements of fact' that refer to a product's absolute characteristics may constitute false advertising, while general, subjective, unverifiable

---

company name of LYFT, through the LYFT smartphone application, and pursuant to the LYFT Terms of Service. [8] [DE 40: ¶¶ 57-62, 87, 93].   Specifically, LYFT is acting as if it were a passenger service company pursuant to the aforementioned definitions. [DE 40:  ¶ 58]. Dispatching drivers to passengers is the *Sine Qua Non* of a passenger service company. MIAMI-DADE COUNTY, FL, Code § 31-100(b). Indeed, a passenger service company exists entirely to dispatch drivers to passengers, and then to provide services to those passengers. *Id*.  Moreover, the Plaintiffs submit that simply because LYFT does not meet the criteria for obtaining a valid passenger service company license does not mean that it is not acting as a passenger service company, it merely means that it is doing so in violation of the terms of chapter 31-100 of the MDCCO.

claims are 'mere puffery' that cannot." *Marty v. Anheuser-Busch Companies, LLC*, 43 F. Supp. 3d 1333, 1342 (S.D. Fla. 2014). A totality of the circumstances analysis is used to determine whether a statement is puffery, and from this lens, the statement can be paired with others from the party or entity to determine its deceptive nature. *Id*. Therefore, when LYFT says it has a $1,000,000 insurance policy that applies to riders utilizing its for-hire services, this is not puffery because it is a quantifiable statement of fact, rather than a general, unverifiable claim, and because the applicability of its insurance policy is readily ascertainable. *See id*. [DE 40: ¶¶ 80-81]. Plaintiffs have alleged that LYFT's insurance is not, in fact, applicable to riders injured in accidents involving LYFT's for-hire transportation as a result of LYFT's terms of service, and that LYFT's statements regarding its insurance have deceived the riding public and enticed them to offer their business to LYFT instead of the Plaintiffs. [DE 40: ¶¶ 80-81, 180-81]. Again, since this Court is bound to accept these allegations as true, dismissal is not warranted.

Alternatively, even if LYFT's advertisement regarding its insurance was merely misleading as opposed to literally false (which is denied), Plaintiffs satisfy the pleading demands at the dismissal stage, as the Plaintiffs have sufficiently alleged that LYFT's representations regarding insurance are misleading and that the decisions of the riding public have been materially influenced by them. [DE 40: ¶¶ 180,181]. And, contrary to LYFT's argument that the Plaintiffs have not alleged any facts to show that any passenger was deceived or misled into using LYFT, Plaintiff's specifically allege that "[a]s a result of these false representations, customers have been and are induced to offer their business to LYFT instead of for-hire license holders and operators of authorized for-hire transportation services . . . ." [DE 40: ¶ 181].  Thus, Plaintiffs have alleged an actionable Lanham Act claim.

Finally, although Plaintiffs are not required at the dismissal stage to prove their claims, the Complaint provides examples of LYFT's misrepresentations to show that such statements were false. For instance, Plaintiffs allege that any insurance would be moot due to lengthy disclaimers in their customer agreements, and further allege that LYFT has no insurable interest in its drivers. [DE 40: ¶¶ 80-84, 87-95].  In any event, even if LYFT's insurance is real, there are still material issues of fact as to its applicability to LYFT's passengers and drivers. These issues may be addressed on summary judgment or at trial but not a motion to dismiss. Indeed, that was the holding of the Texas district court when it rejected LYFT's claim that it was entitled to

dismissal of a Lanham Act claim based on its alleged misrepresentations regarding insurance. *Greater Houston Transp. Co.,* 2015 WL at *16-17.

**G.    The Complaint States A Plausible Florida Unfair Competition Claim.**

In Florida, common law "[u]nfair competition … acts as an umbrella for all statutory and non-statutory causes of action arising out of business conduct which is contrary to honest practices in industrial or commercial matters." *Chassis Master Corp. v. Borrego*, 610 F. Supp. 473, 479 (S.D. Fla. 1985). Plaintiffs allege that LYFT is guilty of numerous acts and practices that meet this flexible standard for recovery [DE 40: ¶¶ 193-201], yet LYFT only mentions the allegations regarding its violations of Chapter 31 and its alleged misrepresentations. [DE 50:19]. Dismissal should be denied for that reason alone.

In any event, LYFT is wrong in arguing that Plaintiffs' common law unfair competition claim is infirm because it must be steeped in some other tort.  [DE:50:18-19]. "To state a claim for unfair competition under Florida common law a party must plead: "(1) deceptive or fraudulent conduct of a competitor and (2) likelihood of consumer confusion." *Noveshen v. Bridgewater Assocs., LP*, 47 F. Supp. 3d 1367, 1376 (S.D. Fla. 2014) (citing *Third Party Verification, Inc. v. Signaturelink, Inc.*, 492 F. Supp. 2d 1314, 1324-25 (M.D. Fla. 2007)). Plaintiffs meet this threshold burden at the pleading stage.   Among other things, Plaintiffs (Count VII) allege, that LYFT engages in fraudulent conduct by operating in the marketplace without being subject to the same "fees, costs, and qualifications" as Plaintiffs, and by making "false or misleading statements of fact about its products/services. [DE 40: ¶ 199].   And Plaintiffs plead that LYFT's "deceptions are material in that they are likely to influence the decisions" of persons seeking the services of LYFT and the Plaintiffs. [DE: 40:¶¶ 199]. Consequently, Plaintiffs have met their pleading burden since, as noted, a defendant may be held liable for common law unfair competition in Florida when that defendant has engaged in "business conduct which is contrary to honest practices in industrial or commercial matters." *Chassis Master Corp.,* 610 F. Supp. at 479.

Moreover, the unfair competition claim is not grounded in Chapter 31. It is not LYFT's violations of Chapter 31 that are relevant per se to this claim, but the fact that LYFT is competing with Plaintiffs without being subject to the same costs and restraints as Plaintiffs are. In this claim, Plaintiffs do not seek to enforce or otherwise hold LYFT to Chapter 31's regulations, but argue that competing in the for-hire market without being subject to those

regulations is a form of unfair competition. *See Boston Cab Dispatch, Inc. v. Uber Technologies, Inc.*, 2014 WL 1338148, at \*6-7 (D. Mass. Mar. 27, 2014) (denying motion to dismiss unfair competition claim alleging that UBER operates its service without incurring the expense of compliance with Massachusetts law and Boston ordinances). And to the extent this unfair competition claim is also subject to the misrepresentations that underpin the Lanham Act claim, Plaintiffs should survive a dismissal for the same reasons that claim does.

**H.      The Complaint States A Plausible Claim For Declaratory Relief.**

In addition to its private right of action argument, and its argument that Chapter 31 does not apply to it, which Plaintiffs have addressed and refuted previously, LYFT also contends that Plaintiffs' declaratory judgment count fails because they are not seeking a declaration of their own rights.  [DE: 48:4].  That is not the case.  Plaintiffs, first and foremost, seek a declaration of the scope of their property rights which Plaintiffs contend provides a private right of action to protect the nature and scope of that property right.  [DE: 40: ¶¶ 206-07, 211].  Moreover, to the extent Plaintiffs seek a declaration that LYFT is operating illegally, that declaration is in the context of Plaintiffs' property rights. Plaintiffs allege that LYFT's illegal operations impinge on Plaintiffs' intangible property rights.  The question is not whether Plaintiffs would be a stranger to an action by the Miami-Dade County against LYFT, but, as alleged, whether Plaintiffs may enforce their property right in the absence of a county enforcement action.

**I.      LYFT Has Shown No Basis For This Court To Abstain From Hearing This Case.**

LYFT requests the Court to abstain from exercising jurisdiction pursuant to the doctrine articulated in *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). In *Burford*, the Supreme Court held that federal courts should abstain from reviewing decisions of the Texas Railroad Commission regarding oil rights in the east Texas oil field.  *Id*. at 332-34.  Because Texas "provides a unified method for the formation of policy and determination of cases by the Commission," the Court said, "judicial review … in the state courts is expeditious and adequate," such that federal review creates confusion and risks inconsistent adjudications.  *Id*. at 333-34.

*Burford* has no application to this action where Plaintiffs allegations pose no risk of inconsistent adjudications.   First, LYFT entirely sidesteps the required analysis by ignoring that "[t]he critical part of the Supreme Court's *Burford* abstention doctrine is deciding whether this result transcends the case at bar or whether hearing this case will be disruptive of state efforts to establish coherent policy."  *Stonecrest Income & Opp. Fund-1, LLC v. Hicks*, 2013 WL 5798691,

*1 (M.D. Fla. Oct. 28, 2013).  By seeking to expand the doctrine to include any instance in which the State may regulate a particular area, without explaining "how the result in this case transcends the parties involved," LYFT 's "view of *Burford* abstention, rather than being a narrow exception, would eviscerate federal court's diversity jurisdiction." *Id*.  This is all the more so given that this lawsuit is in federal court because of CAFA's jurisdictional requirements [DE 40:¶1].  Essentially LYFT is not asking this Court to abstain from jurisdiction, it is asking this Court to ensure there is no forum for this lawsuit at all.

Moreover, as shown above, the local authorities have determined that Transportation Network Platforms (as LYFT calls itself) violate Chapter 31, [DE 40:¶49-64], ensuring there is no risk of inconsistent adjudications.   Indeed, this Court's ruling whether LYFT violates Chapter 31 as it currently stands could not possibly impact the State of Florida's or Miami-Dade County's decision whether to bless LYFT (and UBER) through new legislation. A finding that LYFT currently operates outside the bounds of the law cannot impact new legislation to legalize LYFT.  As this Court has ruled, "[t]he central concern of *Burford* abstention is to prevent federal courts from deciding unsettled questions of state law that relate to a complex state regulatory scheme." *Lamar Co., LLC v. City of Stuart, Fla.*, 2009 WL 690629, *3 (S.D. Fla. Mar. 16, 2009).  Just as in *Lamar Co.*, this action presents settled questions of law pertaining to private parties with no need for the Court "to guess at the resolution of uncertain and difficult issues of state law." *Id*. at *4.

## CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that LYFT's Motion to Dismiss their Complaint be denied in all respects. In the alternative, Plaintiffs request that they be granted leave to amend their Complaint to cure any pleading deficiencies that the Court may perceive since amendment would not be futile. *Crowe v. Boatright RR. Cos.,* 2014 WL 3889875 at *3 (N.D. Ala. Aug. 7, 2014); *Manzo v. Uber Technologies, Inc.*, No. 13 C 2407, 2014 WL 3495401 at *5 (N.D. Ill. July 14, 2014).

**Respectfully submitted this 5th Day of June, 2015.**

| | |
|---|---|
|   /s Daniel M. Samson  . |   /s Ralph G. Patino  . |
| Daniel M. Samson, Esq. | Ralph G. Patino, Esq. |
| Florida Bar No. 866911 | Florida Bar No. 768881 |
| dan@samsonappellatelaw.com | Ryan P. Forrest, Esq. |
| Samson Appellate Law | Florida Bar No. 111487 |
| 201 S. Biscayne Blvd., Suite 2700 | service@patinolaw.com |
| Miami, Florida 33131 | RForrest@patinolaw.com |
| T: (305) 341-3055 | Patino & Associates, P.A. |
| F: (305) 379-3428 | 550 Biltmore Way, Suite 740 |
| *Attorneys for the Plaintiffs* | Coral Gables, Florida 33134 |
| | T: (305) 443-6163 |
| | F: (305) 443-5635 |
| | *Attorneys for the Plaintiffs* |

## CERTIFICATE OF SERVICE

I hereby certify that on June 5, 2015, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner.

By:     /s Ralph G. Patino    .
**RALPH G. PATINO, ESQ.**
Florida Bar No. 768881

*[Service List Follows]*

- 21 -

## SERVICE LIST

Robert M. Brochin, Esq.
Florida Bar No. 0319661
Brian M. Ercole, Esq.
Florida Bar No. 102189
Melissa M. Coates, Esq.
Florida Bar No.: 111420
Bercole@morganlewis.com
Rbrochin@morganlewis.com
mcoates@morganlewis.com
Morgan, Lewis, Bockius, LLP
200 S. Biscayne Blvd., Suite 5300
Miami, FL 33131-2339
Phone: 305-415-3303
Fax: 877-432-9652
*Attorneys for Uber Technologies, Inc.*

Andrew Kemp-Gerstel, Esq.
Florida Bar No. 44332
Junaid N. Savani, Esq.
Florida Bar No. 88816
Service@lgplaw.com
akg@lgplaw.com
jns@lgplaw.com
mkv@lgplaw.com
Liebler, Gonzalez & Portuondo
44 W. Flagler St.
Miami, FL 33130
Phone:  305-379-0400
Fax:      305-379-9626
*Attorneys for Lyft, Inc.*

Danny David, Esq.
Texas Bar No. 24028267
Danny.david@bakerbotts.com
Baker Botts LLP
One Shell Plaza
910 Louisiana Street
Houston, Texas 77002
Phone: 713-229-4055
Fax: 713-229-2855
*Attorneys for Lyft, Inc.*